**Albert Joseph FORN, Petitioner–Appellant,**

v.

**Thomas A. HORNUNG, Warden, Respondent–Appellee.**

**No. 02–55287.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 2003.

Filed Sept. 8, 2003.

As Amended Sept. 24, 2003.

Thomas T. Ono, Los Angeles, CA, for the petitioner-appellant.

David F. Glassman, Deputy Attorney General for the State of California, Los Angeles, CA, for the respondent-appellee.

Before: LAY,* HAWKINS, and TALLMAN, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge.

Petitioner–Appellant Albert Joseph Forn ("Forn") seeks a writ of habeas corpus on his 1998 California solicitation of murder and conspiracy to commit murder conviction, arguing that his rights under the Confrontation Clause were violated by the admission of an extrajudicial statement given by his accomplice, James Hill. We must decide whether Hill's statement, admitted under the "against penal interest" hearsay exception, and its surrounding circumstances call the trustworthiness of Hill's statement into question such that Forn's inability to cross-examine Hill violated the Sixth Amendment. We conclude that while the admission of Hill's statement was improper, the error was harmless under contemporary Supreme Court authority.

## FACTS AND PROCEDURAL HISTORY

### The November Statement

Forn was convicted of conspiring with and soliciting James Hill (a/k/a "Corunell David Hill" and "James Willis") to murder Joe Crail, Forn's former business associate. The chain of events that led the authorities to Forn began with Hill's arrest for attempted extortion outside Crail's office on November 13, 1996. While Hill was under arrest, police detectives conducted a videotaped interrogation, during which Hill made a statement incriminating both himself and Forn in a scheme to murder Crail. Hill stated that he had been offered $50,000, with $10,000 paid up front, plus additional compensation to kill Crail by an unidentified "rich" lawyer. Hill claimed he had been offered a legal defense if he got caught, and that he had been promised his family would be taken care of if he went to prison. He said that the hit was to take place before Thanksgiving because of "some legal situation," and suggested that someone else might be hired if he did not succeed. Hill told

* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

police that the lawyer wanted Crail to sell stock, but then "changed his mind" and said " '[i]n so many words' that '[h]e's got to go.' " Hill also claimed the lawyer had instructed him to make it look like a robbery. Hill denied ever "doing a hit" before, and stated that he "did not particularly want to go through with killing [Crail]" and that he did not "want to see the man get hurt period."

During the interview, Hill placed a phone call to Forn, during which Hill identified himself as "Corunell" and indicated that the intended victim (Crail) was "kind of scared." During this conversation, Forn said he did not think it was a good idea to talk on the phone, "[a]lthough it would be illegal to tap a lawyer's phone," and the two agreed to meet the next day at a restaurant in Forn's neighborhood.

The California Court of Appeal stated that "from the first moments of the taped interview, [Hill] expressed the belief that the detectives were 'going to need [him]' to 'get the man up higher,' " and that Hill "suggested that if he cooperated and the detectives got their man, he be set free." *People v. Forn,* No. B126864 at 5 (Cal. Ct.App. June 6, 2000) (unpublished). The court also found that Detective Luther "said something about 'figur[ing] out a way to facilitate that.' " When mention was made of Hill meeting Forn wearing a wire, Detective Luther said "This is a time that we're gonna do something for you if anything can be done." *Id.* When Hill expressed concern about opening himself up for a third strike conviction, Detective Luther said, "We first have to establish what you can do for us.... Then we have to ... talk it over with the District Attorney to see if it's legally okay for us to do what you're asking us to do...." When Hill objected to the fact that the detectives had not promised him anything, Detective Luther responded, "Well, why I'm not making any promises is because you haven't

been able to establish your ability to do anything for us, so we have nothing to be able to discuss...." *Id.* at 6. However, the detectives also pointed out that Hill had not been booked.

Toward the end of the interview, Detective Luther stated to Hill that the District Attorney was "more than willing" to use Hill as a witness and "he cannot use you as a witness and prosecute you at the same time." Therefore, Detective Luther told Hill: "[I]f you help us get this guy, we're pretty much committed that we have to let you go because we have to use you as a witness." *Id.* at 7. Detective Hart then confirmed with his supervisor that Hill would not be booked.

*The Taped Meetings*

Hill met with Forn twice on November 14, the day following Hill's statement, and the detectives wired Hill so that his meetings with Forn could be taped. Their first meeting occurred at a fast food restaurant. Hill told Forn he had met with Crail and told him his life was in danger. Hill said he could "take [Crail] out at 3:00," and said he wanted to "get this thing over with." Forn responded, "From what I understand, the contract is out there." Hill asked, "You want me to finish it then?," to which Forn replied, "When you produce results the contract is consummated." Forn also stated that he did not need any evidence to show that Hill "took him out" because if anything happened to "him" it would be in the news.

After some further discussion about payment, Forn said, "Actually, technically, and actually, I don't know what you're talking about," and warned Hill that bugging their conversation would be illegal. Hill promised to call "as soon as I pop him." Forn advised Hill not to get caught and said, "I think you want it to look like a robbery."

Following this meeting, the detectives arranged for Hill to have possession of

Crail's wallet and a photograph of Crail appearing to have been shot. Hill then called Forn in Detective Hart's presence and told him "he had completed the job." Forn and Hill met that same day outside a restaurant which was being staked out by police. Hill showed Forn Crail's wallet and the "post-mortem" photograph, and Detective Larson testified he saw Forn smile when Hill showed him the photograph. Forn said something about selling or dumping the credit cards, and warned Hill that leaving town would look suspicious. Hill claimed to have taken Crail to an out-of-the-way place to shoot him, and said that it might take a day or two for the body to be found. Forn was arrested following this meeting.

*The December Statement*

On December 10 and 11, Detective Hart conducted another, this time untaped, interview with Hill, during which Hill described more fully the events leading up to his first meeting with Forn. Hill described how Lou Wyatt, who "was familiar with [Hill]'s criminal background,"[1] asked Hill "if he wanted to make a lot of money" and arranged a meeting between Hill and Forn. Hill stated that at this meeting, Forn indicated that he wanted to use Hill for "some type of fraud or forgery," but that Hill brought up the idea of "eliminating" Crail instead. Hill claimed that Forn told Hill he "didn't give shit" because "the guy was a scumbag" and they then talked about different methods of payment. Hill stated that he met with Forn several times thereafter, and eventually received $5,000 from him.

*The Trial*

At the beginning of Forn's trial, out of the presence of the jury, Hill was called to the stand, and asserted his Fifth Amendment right to refuse to testify. The trial court deemed Hill unavailable to testify for purposes of the California Evidence Code, which allows for the admission of hearsay statements made by unavailable declarants if the statement, when made, "so far subjected [the declarant] to the risk of civil or criminal liability, ... that a reasonable man in his position would not have made the statement unless he believed it to be true." Cal. Evid.Code § 1230. This ruling was made over the defense's objection that Hill's unavailability was caused by the prosecution's refusal to grant him immunity, although there appeared to be no intent to charge Hill with any crime.

The prosecution was then permitted to admit the transcripts and videotape of the November 13 interview for all purposes as a declaration against Hill's penal interest. They were permitted to admit the untaped December interview, through the testimony of Detective Hart, as evidence of Hill's prior state of mind. Cal. Evid.Code § 1251. However, this second statement could not be admitted for the truth of the matter asserted because Hill had already been promised leniency by that time.

Crail testified at Forn's trial, and described how he and Forn had been joint shareholders in some small corporations run by Crail. Crail testified that Forn had been removed from the boards of these corporations, and subsequently sued in an attempt to force dissolution of the corporations and sale of their assets. Instead, Forn was forced to sell his minority shares to Crail. There was also testimony at trial by Crail and his family that documented Hill's attempts to contact Crail and "warn" him about the hit (although Hill never told Crail that Forn was involved). Hill's arrest for attempted extortion occurred after such a meeting with Crail, who had ar-

---

1. The parties stipulated that Hill had seven convictions: two for robbery, one for sale of narcotics, one for forgery, one for petty theft, and two for possession of a blank note or forged instrument.

ranged for police surveillance of the meeting.

Forn testified in his defense, and stated that his relationship with Hill was formed because Forn wanted to find someone to attempt to buy stock from Crail. Forn stated that Wyatt recommended Hill, and that Forn instructed Hill to buy stock under the guise of someone representing athletes looking for investments. Forn said he offered Hill a commission for the value of any stock he purchased. Forn testified that when Hill told Forn he had contacted Crail and told him his life was in danger, Forn told Hill "to forget the whole thing." Forn also testified that Hill told him Crail wanted to kill the man who hired Hill, and Forn claims that he then arranged with Hill to try to catch Crail in the act and take him to the police. Wyatt later told Forn that Hill had "sold him out."

Forn also claimed he did not want to talk on the phone with Hill on November 13 because he was afraid Crail might be taping the call. He further testified that, during the November 14 meeting with Hill, it dawned on him for the first time that Hill was talking about killing Crail instead of setting him up, and that Forn then decided to "play along and try to turn it to his advantage." Forn claimed that he became fearful when Hill showed him the "post-mortem" photograph of Crail, and that Hill told him that if Forn did not pay Hill, he would be next. He offered to pay Hill off in order to placate him.

A jury convicted Forn in March 1998 of solicitation of murder and conspiracy to commit murder, and he was sentenced to 25 years to life.[2] Forn appealed his conviction, and concurrently filed a state habeas petition. The California Court of Appeal affirmed Forn's conviction in an unpublished opinion, and simultaneously summarily denied his habeas petition. The California Supreme Court summarily denied review of the direct appeal, and of the habeas petition.

Forn then filed a federal habeas petition, which the district court denied in January 2002. The district court granted a Certificate of Appealability limited to the issue of whether the admission of Hill's statements warranted habeas relief. Forn's request to expand the COA was denied.

## DISCUSSION

█ The district court's decision to deny Forn's habeas petition is reviewed de novo. *See Eslaminia v. White*, 136 F.3d 1234, 1236 (9th Cir.1998). The Anti–Terrorism and Effective Death Penalty Act ("AEDPA") applies to all federal petitions filed after AEDPA's effective date of April 24, 1996. *Rios v. Rocha*, 299 F.3d 796, 799 n. 4 (9th Cir.2002). Under AEDPA, a habeas corpus petition cannot be granted unless the state court decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was (2) "based on an

---

**2.** At the end of testimony, the defense had requested a mistrial, alleging that a case pending against Hill in Santa Monica was "trailing behind" Forn's trial. The court denied the motion, but "expressed concern about the possibility that there was a deal or an understanding that [Hill] would get leniency in Santa Monica if he asserted his Fifth Amendment rights to keep himself unavailable as a witness in the present case."

Following the verdict, Forn made a motion for a new trial, in which he made the claims addressed in this appeal, and renewed his charge that Hill was rewarded for his refusal to testify with lenient treatment in the Santa Monica case. After hearing testimony, the trial court concluded that the immunity process had not been manipulated. Forn reiterated this claim in his opening brief, but his Certificate of Appealability is restricted to his Confrontation Clause claim.

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2). In addition, factual determinations made by the state court have the presumption of correctness, and can only be rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). When reviewing a state court's analysis under AEDPA, this court looks to the "last reasoned decision" as the basis for its judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir.2002).

■ In all criminal prosecutions, the accused has a right "to be confronted with the witnesses against him." U.S. Const., amend. VI. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Thus, when the government attempts to introduce an out-of-court statement of a declarant who is unavailable to testify, the court must determine whether the Confrontation Clause permits the government to deny the accused his usual right to cross-examine the declarant. *Lilly v. Virginia*, 527 U.S. 116, 124, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion). The Supreme Court has held that cases like this one, where the declarant is unavailable,[3] present concerns at the "core" of the Clause, because

> [t]he primary object of the constitutional provision in question was to prevent depositions or *ex parte* affidavits ... being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the ac-

cused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury, in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*California v. Green*, 399 U.S. 149, 157–58, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (quoting *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895)). The Supreme Court has found this testing to be so important that "the absence of proper confrontation at trial calls into question the ultimate integrity of the fact-finding process." *Ohio v. Roberts*, 448 U.S. 56, 64, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (internal quotations omitted).

In *Roberts*, the Court set forth a framework for determining whether admission of an extrajudicial statement violated the Confrontation Clause, holding that hearsay statements bear adequate "indicia of reliability" to admit them against an accused when: (1) "the evidence falls within a firmly rooted hearsay exception," or (2) contains "particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. 2531. The Supreme Court applied the *Roberts* framework to accomplice confessions in *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), and a plurality of the Court found that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence."[4] *Id.* at 134, 119 S.Ct. 1887.

---

**3.** A witness is considered unavailable for purposes of the Confrontation Clause if "the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). Because Forn's COA does not extend to his claim that the

prosecution granted Hill immunity in return for his refusal to testify, we presume Hill's unavailability.

**4.** Although *Lilly* is a plurality decision, we have consistently viewed the case as binding precedent. *See, e.g., Hernandez v. Small*, 282

■ *Lilly* noted that the admission of hearsay under this exception was "of quite recent vintage" and that the category "encompasses statements that are inherently unreliable," namely, cases "in which the government seeks to introduce a confession by an accomplice which incriminates a criminal defendant." *Id.* at 131, 130, 119 S.Ct. 1887 (internal quotations omitted). The court held that such statements "function similarly to those used in the ancient *ex parte* system," and pointed to a line of authority holding that accomplice confessions are untrustworthy. *Id.* at 131, 119 S.Ct. 1887; *see also Bruton v. United States*, 391 U.S. 123, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (such statements are "inevitably suspect"). Thus, the Court held, "[i]t is clear that our cases consistently have viewed an accomplice's statements that shift or spread the blame to a criminal defendant as falling outside the realm of those 'hearsay exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to[the statements'] reliability.'" *Id.* at 133, 88 S.Ct. 1620(quoting *White v. Illinois*, 502 U.S. 346, 357, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992)).

Hill's November 13 statement was admitted against Forn under the "against penal interest" exception, and the facts of this case are therefore materially indistinguishable from *Lilly* in this regard. Thus, the California courts' reliance on the "against penal interest" exception in finding that the admission of Hill's statement did not violate Forn's rights under the Confrontation Clause was contrary to clearly established federal law.

■ However, the admission of Hill's statement may still satisfy the Confrontation Clause if it contains "particularized guarantees of trustworthiness" such that the statement may be considered inherently reliable, even if it does not fall within a firmly rooted exception to the hearsay rule. *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. However, the nature of Hill's statements and the circumstances under which they were made make clear that the November 13 statement to police did not possess such guarantees of trustworthiness that adversarial testing would have been of little value. To the contrary, close examination of the statement shows that cross-examination would have been essential.

The *Lilly* plurality held that guarantees of trustworthiness were "highly unlikely" to exist for accomplice confessions that inculpate a defendant "when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subject to adversarial testing." *Lilly*, 527 U.S. at 137, 119 S.Ct. 1887. Such conditions were clearly present in this case. Further, Hill's statement bears indicia of *un*reliability, most importantly, the strong indications that he was speaking with the intent to garner favor from the police.

*Lilly* held that a statement against interest becomes unreliable when the declarant perceives that it is no longer against his interests to speak up, in particular, when the declarant attempts to implicate an accomplice in exchange for leniency. *Id.* at 131–33, 119 S.Ct. 1887. The California court reasoned that because the statement exposed Hill to liability for murder for hire when he was only being held for extortion, it was truly against his interest,

---

F.3d 1132, 1140, 1141–42 (9th Cir.2002) (discussing *Lilly* in the context of collateral review of a state court decision under AEDPA); *United States v. Boone*, 229 F.3d 1231, 1233 (9th Cir.2000). Therefore, *Lilly* is "clearly established federal law" for purposes of AEDPA.

even though it attempted to inculpate Forn. However, this reasoning proves too much. If a declaration implicating an accomplice can be found reliable whenever keeping silent would have been smarter, then most, if not all, such declarations would be admissible. More importantly, the state court's conclusion ignores clear evidence that Hill was actively seeking lenient treatment throughout his interaction with police. In this case, Hill clearly believed that "full disclosure" could only help him: "I'd put it in writing. I would be willing to testify. You got me hooked up. I'm on parole. I can't go nowhere. I'm locked in."

*Lilly* also recognized that "the absence of an express promise of leniency" does not enhance the reliability of a statement because "[t]he police need not tell a person who is in custody that his statements may gain him leniency in order for the suspect to surmise that speaking up, and particularly placing blame on his cohorts, may inure to his advantage." 527 U.S. at 139, 119 S.Ct. 1887. Hill's statements show he believed he could get immunity, not only from liability for the conspiracy to murder to which he was confessing, but from all liability for the encounter, including the original attempted extortion charge. Hill submitted an affidavit in March 1999, stating: "At *no time* while making my statements did I feel that I was at *any risk of any criminal prosecution* regarding my activities with Joe Crail and Albert Forn." (emphasis added). In fact, Hill appears to have been correct, as he was never charged with a crime in connection with his relationship to Forn.

This concern for the reliability of Hill's statement is exacerbated given the *quid pro quo* nature of the colloquy between Hill and the detectives. From the beginning of Hill's statement there were, at the very least, strong hints made by the detectives interrogating Hill that he would re-

ceive leniency or even outright immunity from prosecution if his statements established that he could "do something" for them. While the detectives did not make an outright promise to Hill until later in the interview, the California Court of Appeal's statement of facts recognizes that Hill was actively seeking the benefit of immunity throughout his taped statement. Under these circumstances, the California court's conclusion that Hill was reliable because he was subjecting himself to third-strike liability is unreasonable.

The California court's conclusion that the statement was reliable because "everything [Hill] said relevant to [Forn]'s guilt was equally self-inculpatory" is unreasonable for the same reasons. The Supreme Court has stated that "[o]ne of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." *Williamson v. United States*, 512 U.S. 594, 599-600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). This can mean not only interspersing exculpating statements with inculpating ones, but also making statements that are both exculpatory and inculpatory at the same time. *Lilly* was concerned with accomplice attempts at either "shifting *or* spreading" blame. *Lilly*, 527 U.S. at 133, 119 S.Ct. 1887 (emphasis added).

The state attempts to distinguish *Lilly* from this case by arguing that the declarant in *Lilly* was "making every attempt to describe himself as blameless." While it is true that Hill was admitting to a significant role in the alleged plan to murder Crail, the context of Hill's statements makes clear that Hill and the declarant in *Lilly* were simply using different tactics with the same ultimate goal: to exculpate themselves and gain immunity. It is clear from Hill's discussions with the officers who questioned him that his statements

were imbued with self-interest and the belief that, as the California court put it, "the detectives were going to need him to get the man up higher." Hill was positioning himself to become "important" to the investigation and prosecution of Forn. Once we acknowledge this truth, it becomes clear that Hill's statements were just as self-serving as if he had disclaimed all involvement.

Indeed, the folly in concluding that an accomplice's statements are trustworthy because they implicate him as well is readily shown by examining Hill's statements. While he originally implied to police that the idea for the hit originated with Forn, Hill later stated, after being promised immunity, that the hit was his own idea. Although the first statement inculpated Hill as well as Forn (given that Hill was admitting to participation in a conspiracy to murder), it proved unreliable in its details because of Hill's attempt to shift blame from himself. Thus, the state is not aided by cases that allow the admission of statements which "in no way attempted to shift blame to another or curry favor at the expense of others." *United States v. Photogrammetric Data Services, Inc.*, 259 F.3d 229, 245 (4th Cir.2001); *see also Denny v. Gudmanson*, 252 F.3d 896, 903 (7th Cir.2001) (no Confrontation Clause violation because "[t]he circumstances under which[the statements] were made offer no reason to suspect ... ulterior motive, or desire to curry favor from law enforcement authorities").

In circumstances such as these, where a strong inference can be drawn that the declarant was expecting at least partial immunity, that he inculpated himself while inculpating the defendant does not provide his statements with sufficient reliability to deprive the defendant of his right to confrontation. Even if *Lilly* stands only for the proposition that extrajudicial statements that are not truly self-inculpatory

violate the Confrontation Clause, it is clear that Hill's statements fall within this category.

Finally, Hill's statement does not bear particularized guarantees of trustworthiness simply because it is corroborated by Forn's "own actions," as the state court held. *Lilly* explicitly rejected the argument that the trustworthiness of a statement for purposes of the Confrontation Clause could be judged in relation to other corroborating evidence, finding it "irrelevant" that other evidence at trial corroborated the declaration. 527 U.S. at 137–38, 119 S.Ct. 1887. This principle was first announced in *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), when the Court, interpreting the Confrontation Clause, held that "hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." *Id.* at 822, 110 S.Ct. 3139.

That evidence is somehow provided by the defendant himself does not change its character as "other evidence," and has no more bearing on the statement's "inherent trustworthiness" than would a piece of evidence from other sources. The rationale for looking to the inherent trustworthiness of a statement is "the reason of the general [hearsay] rule," which looks for a "basis for supposing that the declarant is particularly likely to be telling the truth" such that cross-examination is unnecessary. *Id.* at 822–23, 110 S.Ct. 3139 (internal quotations and citation omitted). The supposed truth of a statement because it has been corroborated is irrelevant under such a rationale, regardless of the source of the corroboration. *Id.*

That this is so is vividly demonstrated in this case, where Forn's statements and actions not only corroborated Hill's version of events, but were also consistent with

Forn's own account of their relationship. That Forn discussed murder at the November 14 meetings with Hill is consistent with Forn's claim that he realized during his first meeting with Hill that Hill was talking about killing Crail, and then "decided to play along and try to turn it to his advantage." That Forn had earlier meetings and conversations with Hill is also consistent with Forn's claim that he was soliciting Hill's services in an attempt to fraudulently buy stock from Crail. Thus, that Hill's statement fits the facts gives us no independent assurance that he is telling the truth such that adversarial testing would be unnecessary. To the contrary, cross-examination would be critical to test the credibility of these two competing versions of events.

Because Hill's November 13 statement was made in police custody, was not truly against his interest, and was made with an apparent motive to fabricate or exaggerate, there is nothing to support its trustworthiness, and its admission without an opportunity to cross-examine Hill violated Forn's rights under the Confrontation Clause. It is precisely this sort of case that Justice Scalia referred to as a "paradigmatic Confrontation Clause violation" in *Lilly,* 527 U.S. at 143, 119 S.Ct. 1887 (Scalia, J., concurring in part and concurring in the judgment).

*Harmless Error*

■ Forn is not entitled to relief unless he can establish that the error " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abramson,* 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (Confrontation Clause violations subject to harmless error analysis). We conclude that the improper ad-

mission of Hill's statement did not have a "substantial and injurious" effect on the verdict, and the error was therefore harmless.

Had Hill's statements not been admitted under an exception to the hearsay rule, the state would nevertheless have been able to introduce all or most of Forn's taped statements as admissions. *See* Cal. Evid.Code § 1220. In addition, some of Hill's statements to Forn would have been admissible as non-hearsay, if they were offered to show only that they were said, and not to prove their truth. *See* Cal. Evid.Code § 1200(a). Therefore, even if Hill's affirmative statements about Forn had been excluded, the state would have been able to introduce significant evidence of the circumstances and content of Forn's conversations and meetings with Hill. This evidence would have provided a reasonable jury with ample support for a finding that Forn had solicited and conspired with Hill to murder Crail.

The trial was, in large measure, a contest between two explanations for the series of meetings and phone calls between Hill and Forn. A reasonable jury could have concluded that Forn's version of events provided in his trial testimony simply did not square with his taped statements. While Forn's statements to Hill were sometimes vague, many of them support Forn's culpability. Forn's repeated expressions of concern that people were tapping his phone or bugging their conversation, his explicit statements about providing Hill with a legal defense, and his deliberate attempts to remain vague in discussing the aim of his association with Hill all support the conclusion that something more than an attempted stock transaction was going on.

Forn's November 14 conversations with Hill contained several oblique references to murder, including his statement that "if

anything happened to [Crail]" it would be in the news, and his advice to Hill to make it "look like a robbery." Forn's testimony that he was "playing along" with Hill at this point is less than credible, given the deliberately vague and calculated nature of his statements during the conversation. Further, Detective Larson's statement that Forn "smiled" when shown the "postmortem" photograph undercut Forn's testimony that the photograph made him "fearful."

While Hill's taped statement certainly would have been helpful to the state in presenting a coherent account of events and providing a first-person counterpoint to Forn's narrative, its absence is not enough to create a substantial likelihood of a different result. The ultimate evidence of Forn's guilt lay in the damning circumstances of his meetings and conversations with Hill, which were captured on tape, not merely in Hill's explanation of those events. Absent the admission of Hill's statement, the jury would still have been called upon to judge the credibility of Forn's testimony, and there is nothing to suggest that its conclusion would have been different.

## CONCLUSION

The admission of Hill's statement violated Forn's rights under the Confrontation Clause. Statements against penal interest do not fall within a firmly rooted hearsay exception, and Hill's statement did not possess particularized guarantees of trustworthiness. The state played a large role in the statement's production, and the situation presented Hill with an obvious motive to fabricate or embellish his story. That Hill was effectively inculpating himself as well does not change his evident perception that he was exculpating himself entirely. On these facts, the state court's determination was an unreasonable application of both *Lilly* and *Roberts*. However, even had Hill's statement not been

admitted, ample evidence would still exist to convict Forn of conspiracy to commit murder. Because Forn's explanation of events was implausible, excluding Hill's statement would not have substantially affected the verdict, and its admission was therefore harmless. The district court did not err in denying the petition.

**AFFIRMED.**