**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 18, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DAVID P. STEVENS,

     Petitioner-Appellant,

     v.

JOSEPH ORTIZ, Director, Colorado
Department of Corrections; RICK
SOARES, Warden; and JOHN SUTHERS,
Attorney General, State of Colorado,

     Respondents-Appellees.

No. 05-1250

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 03-CV-00533-REB-BNB)**

---

Madeline S. Cohen, Assistant Public Defender (Raymond P. Moore, Federal
Public Defender, with her on the briefs), Denver, Colorado, for Petitioner-
Appellant.

Laurie A. Booras, First Assistant Attorney General, Appellate Division, Criminal
Justice Section (John W. Suthers, Attorney General, with her on the brief), State
of Colorado, Denver, Colorado, for Respondents-Appellees.

---

Before **HENRY**, **ANDERSON**, and **MCCONNELL**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

John Swiger stated in police custody that he shot and killed David Seiler

under the orders of the Petitioner-Appellant David P. Stevens.  At Mr. Stevens's state trial, Mr. Swiger did not testify, but his statement was admitted into evidence over Mr. Stevens's objection.  A jury convicted Mr. Stevens of first-degree murder and other counts.  On direct appeal, the Colorado Supreme Court concluded that the admission of Mr. Swiger's confession did not violate Mr. Stevens's rights under the Confrontation Clause.  The federal district court denied Mr. Stevens's petition for a writ of habeas corpus under 28 U.S.C. § 2254, and he timely appeals.  We must decide here if the Colorado trial court violated Mr. Steven's Sixth Amendment rights when it admitted the custodial confession of Mr. Swiger, a non-testifying accomplice, that also inculpated Mr. Stevens in a murder-for-hire.

We conclude that the reasoning of the Colorado Supreme Court was contrary to clearly established federal law, and the introduction of the accomplice confession violated Mr. Stevens's rights under the Confrontation Clause.  Further, the Sixth Amendment error was not harmless.  Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253(a) and (c), we reverse the district court's denial of Mr. Stevens's § 2254 petition and remand to the district court for entry of the writ.

## I. BACKGROUND

We briefly summarize the underlying facts and earlier court proceedings. The Colorado Supreme Court described the pertinent facts in more detail.  *See*

*Stevens v. People*, 29 P.3d 305, 308-10 (Colo. 2001); *id.* at 319-22 (Bender, J., concurring in part and dissenting in part).

A.    Mr. Seiler's death and Mr. Swiger's statements

On the evening of February 28, 1993, David Seiler was shot and killed in front of Mr. Stevens's house in Aurora, Colorado.  Police initially investigated Mr. Stevens and Mr. Swiger as suspects in the death but filed no charges.  Mr. Swiger had known Mr. Seiler through Mr. Stevens's drug operations.  Soon after the murder, Mr. Swiger, his girlfriend (Bonnie Clontz), and a young woman who was with Mr. Seiler the night he was shot (Tina Parks) moved to Tennessee.

Two years later, Aurora detectives learned that Mr. Swiger had been bragging to friends in Tennessee about killing Mr. Seiler.  In January 1995, Aurora Detectives Joe Petrucelli and Tony Rodriguez traveled to a Tennessee county jail to speak with Mr. Swiger about his involvement in Mr. Seiler's death. The detectives informed Mr. Swiger of his *Miranda* rights, and he agreed to answer questions.  Rec. doc. 12, ex. A, App. I, at 2 ("Swiger Tr.").  That interrogation and subsequent written statement form the basis of this appeal.

1.    *Initial denial of involvement*

Early in the interview, Mr. Swiger said that Mr. Stevens asked him to murder Mr. Seiler to prevent Mr. Seiler from testifying against Mr. Stevens and two associates in an upcoming trial.  Mr. Stevens offered to pay $5,000 then and

-3-

$5,000 after the murder. When Mr. Swiger said he needed time to think about the offer, Mr. Stevens threatened to hurt his family and kill him.

During the first two-thirds of the interview, Mr. Swiger repeatedly denied killing Mr. Seiler on February 28, 1993. Mr. Swiger told the Aurora detectives he was at home that evening with his family and did not go to a party at Mr. Stevens's house because he was watching his children. Mr. Swiger stated he had only helped Mr. Stevens to dispose of a .38 revolver that may have been involved with the murder. When the detectives asked who shot Mr. Seiler, Mr. Swiger responded that "some guy by the name of Mike" had carried out the murder. *Id.* at 29. Before Mr. Swiger gave more details about Mike, he asked the detectives for assurances they would protect his family. Mr. Swiger later stated several times that he was afraid Mr. Stevens would kill his family and him if he spoke out about Mr. Stevens's murder plot.

Despite Mr. Swiger's denial of any involvement in the murder, the detectives continued to ask him whether excessive drug and alcohol use that evening could have prevented him from remembering that he had shot Mr. Seiler. Mr. Swiger repeatedly said he was drunk the night of the murder and for several subsequent months. He also stated that he had used acid and cocaine on the day before Mr. Seiler's murder. Detective Petrucelli asked Mr. Swiger about how Mr. Stevens had pressured him to carry out the murder, and the detective encouraged Mr. Swiger to explain his role to "get this off [his] chest." *Id.* at 53. Mr. Swiger

-4-

began to cry and responded multiple times that "I'm not sure." *Id.*

The detectives told Mr. Swiger they could not "make [him] any deals," but promised to keep Ms. Clontz and their children safe. *Id.* at 54. Mr. Swiger asked twice to speak with Ms. Clontz, but the detectives refused his request. Mr. Swiger insisted that she had nothing to do with the murder and sought assurance from the detectives that she would not be prosecuted.

2. *Later confession*

After the detectives said they would not prosecute Ms. Clontz, Mr. Swiger changed his story (at page 61 of the 73-page interview transcript) and described a direct role in the murder. Mr. Swiger said he received a call on the night of the murder to drive promptly to Mr. Stevens's house, where Mr. Seiler would soon be leaving. Mr. Swiger stated that he then directed Ms. Clontz to go to the liquor store and buy cigarettes, without informing her of any plan to shoot Mr. Seiler. Mr. Swiger said he then drove to Mr. Stevens's house, parked in a nearby alley, and got out of his car. When Mr. Seiler walked out of the house, he fired twice from a back gate near the house, and then "took off runnin' [and] jumped back in the Mustang" to return to his residence "before Bonnie [Clontz] got back." *Id.* at 63. Mr. Swiger stated that he shot at Mr. Seiler but did not intend to kill him.

Mr. Swiger later responded that Mr. Stevens had specifically directed Mr. Swiger to shoot Mr. Seiler. Mr. Swiger also indicated that he knew he was a suspect in the Colorado murder when the interview began. The detectives had

-5-

earlier told Mr. Swiger that he was a suspect and that they had already interviewed Ms. Clontz. Finally, when asked if the detectives had offered any promises or deals for his statement, Mr. Swiger said, "No, sir, jus' that . . . if I told the truth, my family'd be protected." *Id.* at 72.

After more than two hours of interrogation, Mr. Swiger wrote and signed a statement that summarized his confession.

B.    Trial and direct appeal

Mr. Stevens and Mr. Swiger were charged in connection with Mr. Seiler's death and tried separately in Colorado court. Prior to Mr. Stevens's trial, Mr. Swiger asserted his Fifth Amendment privilege against self-incrimination, and the prosecution offered Mr. Swiger's recorded and written statements. Mr. Stevens filed a motion in limine to exclude the statements. The state district court found the statements against Mr. Swiger's penal interest and admitted the accomplice confession under Colo. R. Evid. 804(b)(3).[1]

---

[1]  Rule 804(b) provides that '[t]he following are not excluded by the hearsay rule if the declarant is unavailable as a witness:" . . .

(3) A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement

(continued...)

-6-

At trial, the prosecution introduced into evidence Mr. Swiger's taped statement–played in full to the jury–and the subsequent written confession. Mr. Swiger's custodial statement was the only direct evidence connecting Mr. Stevens to Mr. Seiler's death. After the jury deliberated for approximately 90 minutes, it asked to hear parts of Mr. Swiger's recorded statement. Shortly after hearing the full taped statement again, the jury reached a verdict. It convicted Mr. Stevens of (1) first-degree murder after deliberation, in violation of Colo. Rev. Stat. § 18-3-102; (2) conspiracy to commit first-degree murder, in violation of Colo. Rev. Stat. § 18-2-201; and (3) solicitation to commit first-degree murder, in violation of Col. Rev. Stat. § 18-2-301. The district court sentenced Mr. Stevens to life imprisonment on the first-degree murder count, and to 24 years' imprisonment each on the conspiracy and solicitation counts. The court ordered the three sentences to run concurrently, but consecutive to a life sentence that Mr. Stevens was already serving on an unrelated conviction.

Mr. Stevens appealed his conviction to the Colorado Court of Appeals, arguing that the admission of Mr. Swiger's custodial statement without cross-examination violated his rights under the Confrontation Clause. The Colorado

[1](...continued)
tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Court of Appeals affirmed. On appeal, the Colorado Supreme Court granted certiorari and affirmed. *Stevens*, 29 P.3d at 308. The Colorado Supreme Court concluded that Mr. Swiger's statement did not fall within a firmly rooted hearsay exception but nonetheless found the statement "admissible because it contained sufficient guarantees of trustworthiness." *Id.* Justice Bender, joined by Justice Martinez, dissented from the majority's conclusion that Mr. Swiger's statement bore sufficient indicia of reliability. *See id.* at 318-33 (Bender, J., concurring in part and dissenting in part). The United States Supreme Court denied certiorari on April 1, 2002.

C.    Federal habeas corpus proceedings

Mr. Stevens timely filed a 28 U.S.C. § 2254 habeas corpus petition, and the federal district court appointed counsel for him. The district court examined the factors that the Colorado Supreme Court had considered to find Mr. Swiger's untested statement reliable. It rejected some of the Colorado court's analysis, concluding that the state court had ruled contrary to clearly established federal law by considering both the voluntariness of Mr. Swiger's statement and evidence that corroborated the details of his confession. Based on this ruling, the district court reviewed the Confrontation Clause issue de novo, no longer applying deference under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Brown v. Uphoff*, 381 F.3d 1219, 1225 (10th Cir. 2004), *cert denied*, 543 U.S.

1079 (2005).

On de novo review, the district court held that the admission of Mr. Swiger's custodial statement without cross-examination did not violate Mr. Stevens's rights under the Confrontation Clause. According to the district court, the statement was (1) truly self-inculpatory, (2) detailed, (3) not offered in exchange for leniency, (4) based upon Mr. Swiger's personal knowledge of the events, (5) not given in retaliation against Mr. Stevens, and (6) given by a declarant who was mentally and physically stable. These factors indicated that the statement was sufficiently reliable.

Mr. Stevens timely appealed, and the district court granted a certificate of appealability on whether the Colorado court's admission of Mr. Swiger's statement violated Mr. Stevens's Sixth Amendment rights.

## II. STANDARD OF REVIEW

Under AEDPA, we may only grant Mr. Stevens habeas relief if the Colorado Supreme Court's adjudication "resulted in a decision that was [1] contrary to, or [2] involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The first ground for relief under AEDPA, a decision that is "contrary to . . . clearly established federal law," id., is met if the state court (1) "applies a rule

that contradicts the governing law set forth in [Supreme Court] cases" or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives as a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 406 (2000). A state court's decision is not contrary to clearly established federal law even if a state court has no awareness of controlling Supreme Court precedent, "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court] precedent." *Early v. Packer*, 537 U.S. 3, 8 (2002). When we review a summary disposition by a state court, we focus on its result rather than any reasoning. *Saiz v. Ortiz*, 392 F.3d 1166, 1176 (10th Cir. 2004), *cert denied*, 125 S. Ct. 2976 (2005); *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999).

However, when applying AEDPA to fully reasoned opinions by state courts, this circuit has not focused solely on the result "where the state court's explicit *reasoning* contravenes Supreme Court precedent." *Brown*, 381 F.3d at 1225 (emphasis added). In *Brown*, we concluded that a state court's reasoning in a Confrontation Clause challenge was contrary to clearly established federal law because it had relied on factors "inappropriate for determining whether a statement is trustworthy." *Id.* We did not apply AEDPA deference and instead reviewed de novo–under the correct factors identified by Supreme Court precedent–whether a constitutional violation occurred. *Id.*; *see also Fulcher v. Motley*, 444 F.3d 791, 805-06 (6th Cir. 2006) (reviewing a Confrontation Clause

-10-

challenge de novo after first holding that the state court's multi-factor test contravened Supreme Court precedent because it considered improper factors).

The second ground for relief under AEDPA–a state court's unreasonable application of clearly established Supreme Court precedent–is met if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

## III. AEDPA REVIEW

First, we identify clearly established federal law "existing at the time the defendant's conviction became final." *Williams*, 529 U.S. at 381. Second, we examine whether the Colorado Supreme Court ruled contrary to, or unreasonably applied such law in its decision.[2]

---

[2]In *Crawford v. Washington*, 541 U.S. 36, 59 (2004), the Supreme Court held that testimonial hearsay may be admitted against a defendant at trial "only where the declarant is unavailable, and only where the defendant has a prior opportunity to cross-examine." *Crawford* does not affect our analysis. Mr. Stevens's conviction became final on April 1, 2002, when the United States Supreme Court denied certiorari with regard to the Colorado Supreme Court's decision on direct appeal. *Crawford* was decided on March 8, 2004, and we do
(continued...)

-11-

A.    Clearly established federal law

The Sixth Amendment of the United States Constitution guarantees an individual accused of a criminal offense the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI.  This right applies in both federal and state prosecutions.  *Pointer v. Texas*, 380 U.S. 400, 406 (1965).  "The combined effect of . . . confrontation–physical presence, oath, cross-examination, and observation of demeanor by the trier of fact–serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings."  *Maryland v. Craig*, 497 U.S. 836, 846 (1990).  Accordingly, an out-of-court statement that falls within an exception to a hearsay rule under a state's evidentiary rules must nonetheless be excluded from a defendant's trial if its admission would deprive him of his constitutional right of confrontation.  *See Dutton v. Evans*, 400 U.S. 74, 80-82 (1970).

Prior to *Crawford*, Supreme Court precedent addressing Confrontation Clause rights held that a testimonial hearsay statement is admissible only if the declarant is unavailable, and only if the statement (1) satisfies "a firmly rooted" exception to the hearsay rule or (2) bears "particularized guarantees of

---

[2](...continued)
not apply the decision retroactively to cases on collateral review.  *Brown*, 381 F.3d at 1225-27.

-12-

trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980). This two-part framework was "unpredictable," *Crawford*, 541 U.S. at 63, in part because the Court "decline[d] to endorse a mechanical test" for assessing trustworthiness, *Idaho v. Wright*, 497 U.S. 805, 822 (1990). Nonetheless, pre-*Crawford* decisions identify several factors that courts should (and should not) consider when determining whether an accomplice's statement is sufficiently reliable to be admitted without cross-examination.

The most relevant Supreme Court decision for our review is *Lilly v. Virginia*, 527 U.S. 116 (1999). In that case, the petitioner Ben Lilly, his brother Mark, and a friend were arrested for a two-day crime spree during which they killed one victim. During police questioning, Mark admitted to certain crimes but stated that Ben and their friend had stolen the guns and Ben had actually shot the victim. *Id.* at 120-21. At Ben's trial, Mark invoked his Fifth Amendment rights and did not testify, but the district court admitted Mark's statements that described Ben as the mastermind and actual shooter. A jury later convicted Ben of murder and other crimes. Ben appealed his conviction and argued that admitting the confession of his brother, a non-testifying accomplice, violated his Confrontation Clause rights. The Virginia Supreme Court affirmed the statement's admission.

A plurality opinion by Justice Stevens, joined by Justices Souter, Ginsburg, and Breyer, concluded that the admission of Mark's custodial statement, untested

by cross-examination, violated Ben's rights under the Confrontation Clause. The plurality first determined that the accomplice's statement, shifting blame to a criminal defendant, was not within a firmly rooted exception to the hearsay rule. *See id.* at 133.

The *Lilly* plurality then evaluated whether the statement bore sufficient indicia of reliability to be admitted without cross-examination. The plurality noted that "[i]t is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when . . . the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing." *Id.* at 137. Thus, admission of an accomplice's confession violates a defendant's Sixth Amendment rights unless the truthfulness of the statement "is so clear from the surrounding circumstances that the test for cross-examination would be of marginal utility." *Id.* at 136 (quoting *Wright*, 497 U.S. at 820).

The *Lilly* plurality identified certain factors improperly considered by the Virginia Supreme Court that should have had little, if any, influence in an analysis for "particularized guarantees of trustworthiness." For example, a declarant's awareness of his *Miranda* rights does not "render the circumstances surrounding his statements significantly more trustworthy." *Lilly*, 527 U.S. at 138. The Supreme Court had earlier concluded in *Lee v. Illinois*, 476 U.S. 530, 544 (1986) that the voluntariness of an accomplice's confession "does not bear on

the question of whether the confession was also free from any desire, motive, or impulse [the declarant] may have had either to mitigate the appearance of his own culpability by spreading the blame or to overstate [the defendant's] involvement [in the crimes at issue]."

In *Lilly*, the plurality also described how a court cannot rely on outside evidence to validate a declarant's unchallenged hearsay statement. "[The fact] [t]hat other evidence at trial corroborated portions of [a declarant's] statements is irrelevant." *Lilly*, 527 U.S. at 137; *see also Wright*, 497 U.S. at 822 (rejecting the "contention that evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears 'particularized guarantees of trustworthiness'") (quoting *Roberts*, 448 U.S. at 66).

The *Lilly* plurality addressed several other factors. It noted that a declarant's self-inculpatory statement is "suspect insofar as [he] inculpate[s] other persons. That a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." *Lilly*, 527 U.S. at 139 (quoting *Williamson v. United States*, 512 U.S. 594, 599 (1994)). Further, the plurality stated, "the absence of an express promise of leniency to [the declarant] does not enhance his statements' reliability to the level necessary for their untested admission." *Id.* Finally, the plurality expressed concern about an officer's use of leading questions during a custodial confession; a declarant in that position has "a natural motive to attempt to exculpate himself as much as

possible." *Id.*

Notably, the concurring opinions of Justices Scalia and Thomas also concluded that the admission of the accomplice's statement violated the Confrontation Clause. Both Justices adopted a categorical approach. *See id.* at 143 (Scalia, J., concurring in part and concurring in the judgment) (referring to the admission of Mark's statement as a "paradigmatic Confrontation Clause violation"); *id.* at 143-44 (Thomas, J., concurring in part and concurring in the judgment).

We reject the state's argument that the holdings of the four-Justice *Lilly* plurality are not clearly established federal law. Under § 2254(d)(1), the "clearly established" phrase "refers to the holdings, as opposed to the dicta of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. In *Lilly*, the categorical rule outlined by Justices Scalia and Thomas reads the requirements of the Confrontation Clause more broadly than the plurality. We take into account these concurrences and characterize the narrower standards set forth in Justice Stevens's plurality opinion as the "holding"–and therefore clearly established federal law. *See Marks v. United States*, 430 U.S. 188, 193 (1977). This treatment is consistent with other circuits that have applied *Lilly's* plurality opinion under AEDPA. *See Fulcher v. Motley*, 444 F.3d 791, 800 n.4 (6th Cir. 2006); *Murillo v. Frank*, 402 F.3d 786, 791 (7th Cir. 2005); *Forn v. Hornung*, 343 F.3d 990, 995 n.4 (9th Cir. 2003)

(citation omitted) (holding that "*Lilly* is 'clearly established federal law' for purposes of AEDPA").

B.     AEDPA review of the Colorado court's decision

Based on several factors, the Colorado Supreme Court concluded that Mr. Swiger's statement to detectives in Tennessee had sufficient guarantees of trustworthiness to be admissible without cross-examination. *Stevens*, 29 P.3d at 314-18. Mr. Stevens challenges the state court's reliance on four of these factors as supporting reliability: that (1) the statement was genuinely self-inculpatory; (2) independent evidence corroborated it, (3) the statement was voluntary; and (4) the detectives did not promise leniency to Mr. Swiger.

1.     *Self-inculpatory nature of Mr. Swiger's statement*

Mr. Stevens first argues that the Colorado Supreme Court ruled contrary to Supreme Court precedent when it stated that "the most important determination as to its trustworthiness is whether the statement at issue is genuinely self-inculpatory or whether it shifts the blame from the confessor to the defendant." *Stevens*, 29 P.3d at 314. The state court found Mr. Swiger's statement was "genuinely self-inculpatory" because he "did not minimize his involvement in the murder nor did he shift the responsibility for committing the murder to the defendant." *Id.* at 315.

In *Lilly*, only three Justices believed "a genuinely self-inculpatory

-17-

statement [in custody] that also inculpates a codefendant" might satisfy a firmly rooted hearsay exception. 527 U.S. at 146 (Rehnquist, C.J., concurring in the judgment). Instead, the *Lilly* plurality (along with Justices Scalia and Thomas) expressly rejected Chief Justice Rehnquist's concurrence. A majority of the Court thus held that an accomplice's custodial confession inculpating a defendant—no matter how much the statement incriminates the declarant—does not fall within a firmly rooted exception to the hearsay rule. *Id.* at 134 and n.5. Importantly, *Lilly* also concluded that portions of a statement exposing a declarant to criminal liability added no reliability to the non-self-inculpatory parts of the statement that inculpate a co-defendant. *Id.* at 138-39 ("[A]s we have explained, such statements [against penal interest] are suspect insofar as they inculpate other persons."); *accord Williamson*, 512 U.S. at 599-600; *Lee*, 476 U.S. at 545.

Accordingly, we conclude that the Colorado court erred not only by assigning relevance to whether a statement is genuinely self-inculpatory, but also by elevating that irrelevant factor to the forefront in its reliability determination. The Colorado Supreme Court's reasoning was therefore contrary to clearly established federal law.

2. *Corroborating evidence*

Mr. Stevens next maintains that the Colorado Supreme Court ruled contrary to *Lilly* and *Wright* by relying on the existence of evidence corroborating Mr. Swiger's statement to support its reliability. In *Wright*, the Supreme Court held

that hearsay evidence admitted against a criminal defendant "must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial." 497 U.S. at 822. In *Lilly*, the Court reiterated the principle: "[t]hat other evidence at trial corroborated portions of Mark's statement is irrelevant." 527 U.S. at 137. Corroboration of portions of an accomplice's confession by other trial evidence creates "a very real danger that a jury will rely on partial corroboration to infer the trustworthiness of the entire statement." *Wright*, 497 U.S. at 824.

Here, the Colorado court "[e]xamin[ed] the record" and "[found] that Swiger provided many details concerning the murder and the defendant's participation that could be independently confirmed." *Stevens*, 29 P.3d at 317. "Swiger displayed a depth of knowledge about the relationship between the defendant and the victim that gives credibility to his claim that the defendant planned the crime." *Id.* The state court considered how Mr. Swiger's interview detailed the shooting at Mr. Stevens's house, the disposal of the gun with Mr. Stevens's assistance, Mr. Stevens's motive for killing Mr. Seiler, and Mr. Stevens's rationale for believing that Mr. Swiger would carry out the murder. *Id.*

The federal district court concluded the state court had ruled contrary to *Wright* by relying on details in Mr. Swiger's statement that other trial evidence could corroborate:

Swiger's statements concerning Steven[s's] motive for killing Seiler,

-19-

how Seiler had been kidnaped and beaten by Stevens, how Stevens had helped to dispose of the murder weapon, and Swiger's position and actions at the time of the shooting all may have been supported by corroborative evidence. In this context, the fact that Swiger provided these details should not be considered as indicating that Swiger's statement was reliable.

Rec. vol. I, doc. 31, at 22. We agree that the Colorado court's reasoning was contrary to federal law because it "bootstrap[ped] on the trustworthiness of other evidence at trial," *Wright*, 497 U.S. at 823, when it considered independent evidence to corroborate details of Mr. Swiger's statements. *See Fulcher*, 444 F.3d at 805 (concluding that a state court contravened federal law when it relied on additional testimony and evidence from the crime scene to corroborate the accomplice's statement).

### 3. *Voluntariness*

Mr. Stevens also maintains that the Colorado Supreme Court erred in its trustworthiness evaluation by considering the voluntariness of Mr. Swiger's statements. The state court held that "[a]lthough police investigators did use some leading questions in the interview, Swiger was not coerced and no improper tactics were used. From the record there is no reason to believe that Swiger's statement was anything but voluntary." *Stevens*, 29 P.3d at 316; *see id.* ("Whatever caused Swiger to start talking about the murder in the first place came from within himself and was not the result of government action.").

The Supreme Court has instructed courts not to consider the voluntariness of a declarant's statement when assessing its particularized guarantees of

trustworthiness. *Lee*, 476 U.S. at 544-45. Neither the apparent voluntariness nor prior *Miranda* warnings have any "bearing on the likelihood of truthfulness of [the declarant's] statements." *Lilly*, 527 U.S. at 138. Further, this circuit has held that "reliance on [voluntariness] is inappropriate for determining whether a statement is trustworthy," and we have concluded that a state court decision relying on the voluntariness of a declarant's statement was contrary to Supreme Court precedent. *Brown*, 381 F.3d at 1225. Because it considered the voluntariness of Mr. Swiger's statement to support the statement's reliability, the Colorado Supreme Court's reasoning in this case is similarly contrary to clearly established federal law.

### 4. *Absence of a promise of leniency*

Finally, Mr. Stevens argues that the state court ruled contrary to *Lilly* when it relied on the absence of a promise of leniency to Mr. Swiger to support its finding that the statement was sufficiently reliable. The Colorado Supreme Court appeared to consider the absence of any express promise of leniency to Mr. Swiger: "The police officers interviewing Swiger expressly informed him on several occasions that he would not receive any deals in exchange for his statement. Furthermore, Swiger did not inquire as to any possible benefit he would receive for cooperating with the investigating officers and making his confession." *Stevens*, 29 P.3d at 316 (footnote and internal citation omitted).

"[T]he absence of an express promise of leniency to [a declarant] does not

-21-

enhance his statements' reliability to the level necessary for their untested admission." *Lilly*, 527 U.S. at 139. "The police need not tell a person who is in custody that his statements may gain him leniency in order for the suspect to surmise that speaking up, and particularly placing blame on his cohorts, may inure to his advantage." *Id*. In *Brown*, we interpreted *Lilly* to mean that "the absence of an offer of leniency" was not a "relevant indici[um] of reliability." 381 F.3d at 1227 n.6. In the instant case, the state court did not treat the absence of any offers of leniency as dispositive, but it apparently considered the factor when it assessed Mr. Swiger's statement for reliability. Because *Lilly* established that the absence of an offer of leniency does not enhance the reliability of the declarant's statement, here too the state court's reasoning was contrary to Supreme Court precedent.

5.    *Conclusion*

In sum, the Colorado Supreme Court's reasoning was contrary to Supreme Court precedent because it considered the "genuinely self-inculpatory" nature of Mr. Swiger's statement as the most important factor in the reliability assessment, *Stevens*, 29 P.3d at 31, and because it also considered other trial evidence, the voluntary nature of the statement, and the absence of a promise of leniency. Accordingly, the state court "applie[d] a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams*, 529 U.S. at 405, and AEDPA deference does not apply. *See Brown*, 381 F.3d at 1225.

## IV. DE NOVO REVIEW

Having concluded that the Colorado court's calculus improperly relied on factors condemned by Supreme Court precedent, we must now review de novo the admission of Mr. Swiger's statements without cross-examination. *See Fulcher*, 444 F.3d at 806; *Brown*, 381 F.3d at 1225. We consider (1) the text of Mr. Swiger's two-and-a-half hour interview and accompanying written confession, and (2) the setting of the confession—who was present, where and when it was made, and other circumstances that may have affected Mr. Swiger's responses. *See Lilly*, 527 U.S. at 139. "[W]e presume the factual findings of the state court and the federal district court are correct unless clearly erroneous." *Brown*, 381 F.3d at 1227 (internal quotation marks omitted).

We are confident that the cumulative impact of several factors related to Mr. Swiger's custodial confession precludes a finding of sufficient reliability. First, and perhaps most importantly, Mr. Swiger provided his confession to police detectives during a custodial interrogation. We recognize that Mr. Swiger was not in custody for the Colorado murder; he was in a Tennessee jail on an unrelated charge. Nonetheless, Mr. Swiger still had reason to believe he was being investigated for Mr. Seiler's death. *See, e.g.*, Swiger Tr. at 71 ("I'd already got word 'way y'all were comin' here, that y'all had a tape.").

Courts have long recognized that an accomplice's confession in police custody "is presumptively unreliable as to the passages detailing the defendant's

-23-

conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another." *Lee*, 476 U.S. at 545. In *Lilly*, Chief Justice Rehnquist noted the Supreme Court's "unbroken line of cases in which custodial confessions laying blame on a codefendant have been found to violate the Confrontation Clause." 527 U.S. at 147 (Rehnquist, C.J., concurring in the judgment) (internal quotation marks omitted). This case fits within that category. *Cf. United States v. Franklin*, 415 F.3d 537, 548 (6th Cir. 2005) (affirming the district court's admission of an accomplice's self-inculpatory hearsay statement, made "not to investigators but to his close friend," that equally inculpated the defendant); *United States v. Manfre*, 368 F.3d 832, 842 (8th Cir. 2004) (affirming the district court's admission of an untested hearsay statement made "casually to an intimate confidante in a setting that does not raise the same concern as *Lilly*").

Second, as Justice Bender's dissent explained, Mr. Swiger consistently described Mr. Stevens as the planner of the murder who also gave him the murder weapon and helped him to dispose of it. While Mr. Swiger eventually confessed to shooting the victim, he sought to minimize his role in several ways: (1) by repeatedly telling detectives that he was drunk on the evening of the murder and had taken drugs the previous day; (2) by claiming before his confession that he only helped Mr. Stevens to dispose of a gun; (3) by stating after the confession that he had to carry out the murder because Mr. Stevens would otherwise kill his

-24-

family and him; and (4) by saying that he tried to shoot the victim without killing him.[3] *Stevens*, 29 P.3d at 328 (Bender, J., dissenting).

Third, while the detectives did not expressly offer a "deal" or leniency to Mr. Swiger for his confession, the detectives implied to Mr. Swiger, and he appeared to believe, that his girlfriend would not be prosecuted and his family would be getting protection as a result of the statement. When the detectives asked Mr. Swiger to confirm that they had not offered any deals for his statement, Mr. Swiger stated "No, sir, jus' that . . . if I told the truth, my family'd be protected." Swiger Tr. at 72.

Fourth, Mr. Swiger exculpated himself (and inculpated Mr. Stevens and "Mike") during the first two-thirds of the statement. These portions of the statement were certainly not declarations against Mr. Swiger's penal interest. We agree with the state court that the level of detail in Mr. Swiger's statement may be a factor in support of reliability, but we also recognize that some of his detailed responses were flatly false. For example, Mr. Swiger claimed that Ms. Clontz went to a liquor store on the night of the murder, but such stores in Colorado would have been closed on a Sunday evening. *See* COLO. STAT. § 12-47-901(5)(b)(II). Before his confession, Mr. Swiger also described in some detail

---

[3]Mr. Swiger's efforts to shift or spread responsibility for the murder apparently were effective to some degree. In his separate trial, he was acquitted of first-degree murder.

that "Mike" from Oklahoma had shot the victim.

Fifth, detectives routinely asked leading questions during Mr. Swiger's custodial interrogation. At one point soon before the confession, Detective Petrucelli asked Mr. Swiger a 500-word "question" reminding him how (a) a "tough Dreamer, not the family Dreamer" may have "come[] out and go[ne] and commit[ed] the murder," (b) he needed to be honest with his family and himself about the murder so that he could get help; and (c) "[his] past is bitin' [him] right in the butt" because "people tell on people." Swiger Tr. at 58-59. At the end of the "question," the detective said that Mr. Stevens and his two associates "should not get away with *any* of this what they made you do." *Id.* at 59. "They shouldn't," Mr. Swiger responded. *Id.*; *see Lee*, 476 U.S. at 544 (concluding that a statement against penal interest was unreliable in part because it was unsworn, "given in response to questions of police who . . . knew what they were looking for," and not subjected to cross-examination).

In sum, we cannot conclude that the reliability of Mr. Swiger's statement is so apparent from the record that cross-examination at Mr. Stevens's trial would have been only of "marginal utility," *Wright*, 497 U.S. at 820. Both parties agree that Mr. Swiger's untested custodial statement does not fall within a firmly rooted exception to the hearsay rule. We now hold that the statement does not bear particularized guarantees of trustworthiness to rebut the presumption of unreliability. Therefore, the statement's admission at Mr. Stevens's trial violated

-26-

his Sixth Amendment rights to confront the witnesses against him.[4]

D.  Review for harmlessness

Mr. Stevens is not entitled to habeas relief unless the Confrontation Clause error arising from the Colorado court's admission of Mr. Swiger's untested statement "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). However, we need not determine whether this error "resulted in actual prejudice," *id.* at 637, because the State concedes that, if we conclude there was Sixth Amendment error, such error would not be harmless. We appreciate the State's professional and responsible acknowledgment that the accomplice confession provided the only direct evidence of Mr. Stevens's involvement in the murder.

## V. CONCLUSION

Accordingly, we REVERSE the district court's denial of Mr. Stevens's 28

---

[4] Although we do not apply the Supreme Court's decision in *Crawford* here, *see Brown*, 381 F.3d at 1225-27, we note that the Court's reasoning in that case also supports Mr. Stevens's Confrontation Clause claim. In particular, the *Crawford* Court observed that several lower courts had applied the two-part *Roberts* test "to admit core testimonial statements that the Confrontation Clause plainly meant to exclude." 541 U.S. at 63. *Crawford* included the Colorado Supreme Court's *Stevens* opinion in a seemingly disapproving string citation of cases that had admitted "custodial confessions implicating the accused." *Id.*

U.S.C. § 2254 petition for habeas relief, and we REMAND to the district court for entry of the writ.