The PEOPLE of the State of
Colorado, Petitioner,

v.

Antonio S. FARRELL, Respondent.

No. 00SC307.

Supreme Court of Colorado,
En Banc.

Oct. 22, 2001.

As Modified on Denial of Rehearing
Nov. 13, 2001. *

* Justice MARTINEZ and Justice BENDER would grant the petition.

Ken Salazar, Attorney General Laurie A. Booras, First Assistant Attorney General, Denver, CO, Attorneys for Petitioner.

James Grimaldi, Denver, CO, Attorney for Respondent.

1.  § 18–3–102(1)(a), 6 C.R.S. (2001).

2.  § 18–3–102(1)(b), 8B C.R.S. (Supp.1996).

3.  § 18–6.5–103(4), 6 C.R.S. (2001).

4.  § 18–4–302(1)(a), 6 C.R.S. (2001).

5.  § 18–3–302, 8B C.R.S. (1986 & Supp.1996).

6.  § 18–4–203(2)(a), 6 C.R.S. (2001).

Justice KOURLIS delivered the Opinion of the Court.

In this case, we address the issue of whether the trial court properly admitted a co-defendant's statement against interest in the case against Defendant Antonio Farrell. The trial court ruled that the co-defendant's confession was reliable and accordingly admitted it into evidence in a redacted form that omitted certain portions of the statement it found to be prejudicial. In *People v. Farrell,* 10 P.3d 672 (Colo.App.2000), the court of appeals reversed the trial court's ruling, concluding that the statement did not possess the particularized guarantees of trustworthiness necessary to justify its admission under the requirements of the Confrontation Clause.

We reverse the court of appeals' decision regarding admissibility of the statement. Specifically, we find that our decision in *Stevens v. People,* 29 P.3d 305 (Colo.2001), controls this case. When we analyze the statement within the framework of *Stevens,* we conclude that it was genuinely self-inculpatory and therefore sufficiently reliable to be admissible.

## I.

On August 18, 1997, a jury convicted Defendant Antonio Farrell of intentional first-degree murder,[1] felony first degree murder,[2] robbery of an at-risk adult,[3] aggravated robbery,[4] second degree kidnapping,[5] two counts of second degree burglary,[6] theft,[7] first degree criminal trespass,[8] and two counts of conspiracy.[9] The trial court sentenced Farrell to a mandatory life sentence for the merged first degree murder convictions and concurrent sentences for the aggravated robbery, kidnapping, second degree burglary, first degree criminal trespass, theft, and conspiracy convictions. In addition, the trial

7.  § 18–4–401(1)(a), 6 C.R.S. (2001).

8.  § 18–4–502, 8B C.R.S. (Supp.1996).

9.  § 18–2–201(1), 6 C.R.S. (2001)(criminal conspiracy to commit first degree murder and criminal conspiracy to commit second degree burglary of a dwelling).

court, finding extraordinarily aggravating circumstances, sentenced Farrell to consecutive sentences totaling fifty-six years for the convictions of robbery of an at-risk adult and second degree burglary against a second victim.[10]

In November 1996, a witness observed a woman, driving a gray four-door sedan, who appeared confused about which way to turn. As the witness attempted to pass that woman's car, she saw one of the two "dark-skinned" males in the back seat exit the car. The witness observed that the male who remained in the car had a gun to the driver's neck. In court, the witness identified Farrell as the person she believed had exited the car. Subsequently, several Brighton residents observed two unfamiliar males leaving the residence of their seventy-six-year-old neighbor, Barbara Castor. They also noticed a broken bathroom window and decided to contact Castor's family who, in turn, contacted the police.

While the police were investigating, Tim Maldonado, the brother of Farrell's girlfriend, arrived at Castor's house. Upon questioning, Maldonado confessed that he had engaged in ransacking Castor's house with Farrell and Farrell's sixteen-year-old companion, Kevin Blankenship. Maldonado admitted that the three had also stolen guns from the garage of a second house. He informed the police officers that, when he expressed concern about whether Castor would return home and discover the three, Defendant and Blankenship told him that it was "taken care of" and that they had put her in the trunk of her vehicle and left her in a field buried under rocks and branches.

Based on information provided by Maldonado, law enforcement officers arrested Defendant and Blankenship in connection with the disappearance of Castor. When the police entered the room to make the arrests, Defendant and Blankenship were standing on opposite sides of a bed. Blankenship was trying to hide something under the mattress. Under Defendant's side of the mattress, police found several automobile registration cards, an insurance card, and an AT & T calling card, all belonging to Castor.

After the officers informed Blankenship of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Blankenship agreed to talk to the officers. The statement that ensued is the subject of this particular controversy. According to Blankenship, he and Defendant had been living in Rockford, Illinois and had come to Colorado to see Defendant's girlfriend. The pair stole a car in Rockford to begin their trip. When that car had mechanical difficulties, they stole a second car in Nebraska, which also developed problems. The third car they stole belonged to Castor.

Blankenship initially told the officers that he and Defendant had stolen the car from a K–Mart parking lot while Castor was looking under the hood of the vehicle and then had ransacked and robbed her house over a period of three days. The officers expressed disbelief that the pair would persist in plundering the house unless they knew that Castor would not return. The officers expressed hope that the victim might still be alive and that "the sooner we find this lady, the better off it's gonna be for everybody involved." They asked if Blankenship felt sorry for the lady and how he would feel if she were his own grandmother. They expressed the need to return Castor to her family.

Blankenship then admitted that he did not know where they had left Castor. He informed the officers that he and Defendant had asked Castor for a ride; Castor agreed and drove the pair to a gas station where she asked them to get out. Blankenship then brandished a BB gun, which looked like a pistol, and told Castor to drive. Blankenship stated that Defendant exited the car and Blankenship forced Castor to drive down a side road where he threatened her with death and made her get into the trunk of the automobile. He then returned and retrieved Defendant. They drove the car a long way until they reached deserted fields. Blankenship informed the officers that he and Defendant tied Castor to a cement structure in a

---

**10.** The court of appeals ordered the trial court to amend the sentence in various respects. That portion of the court of appeals' judgment is not before us on appeal.

field. He explained that they had used pieces of string and Castor's blanket, which Defendant ripped into pieces while Blankenship bound Castor. Blankenship related that, after he and Defendant had secured Castor, they placed logs, rocks, and a spare tire on top of her.

Blankenship claimed that while they were restraining Castor, she pleaded with them. He explained that Defendant Farrell had said that God would "get us for this," so the two said a prayer before departing the scene. Blankenship and Defendant stopped at a gas station to get directions to Castor's residence. They then ransacked the house, searching for valuables. Blankenship informed the police that they had returned to the house several times to continue searching, to sleep, and to shower, describing in detail their actions and behavior over the course of the three-day period. Blankenship also explained that Maldonado had been involved in vandalizing Castor's house. Further, Blankenship confessed that the trio had broken into a second residence to steal guns.

### A.

Based on Blankenship's detailed description of the surroundings where they had restrained Castor, the police located the deceased victim's body covered with 411 pounds of large logs, rocks, and a spare tire. They found her tied to an old washed-out dam with a ripped-up blanket and pieces of string. Law enforcement officers found Castor's blood in the trunk of her vehicle. They found Defendant's fingerprints in the house and the car. The police also recovered three pubic hairs from the shower at Castor's home that matched Defendant's pubic hair. Further, a handwriting analysis demonstrated that Defendant's handwriting was consistent with that found on a check written from Castor's account.

While Farrell was in jail, he had a conversation with a detention facility deputy, in which he described meeting Castor at K–Mart and asking for a ride. He stated that Blankenship pulled a gun on Castor and told Farrell to get out of the automobile. Blankenship returned shortly, with Castor in the trunk. Defendant reentered the car, and they drove away. Defendant stated that thereafter he started to black out and that he didn't want to tell the deputy "because of his defense." Although the trial judge ruled that Defendant's statement was voluntary, he did not admit it at trial because he held that it was obtained in violation of that court's protective order.[11]

Both Blankenship and Farrell were tried on various charges. The trial court severed the trials, and the People sought to admit Blankenship's confession into evidence at Farrell's trial. With certain redactions,[12] the trial court found the statement reliable and allowed it into evidence.

### II.

The court of appeals concluded that admitting Blankenship's confession violated Farrell's constitutional right to be confronted with witnesses against him. *Farrell*, 10 P.3d at 675. The court of appeals determined that the statement's clearly self-inculpatory nature did not establish the requisite reliability necessary to rebut the statement's inherent untrustworthiness. *Id.* at 676. Although we hold that the statement does not fall within a firmly rooted hearsay exception, we conclude that it is nonetheless sufficiently self-inculpatory to be deemed reliable under *Stevens*.

The statement at issue is indisputably hearsay. Hence, we begin our analysis, as we did in *Stevens*, with the applicable hearsay rule. Colorado Rule of Evidence 804(b)(3) provides that, if the declarant is unavailable as a witness, the trial court may admit the declarant's statement against interest into evidence at trial. The Rule defines a statement against interest as:

---

11. On November 26, 1996, the trial court entered a protective order requiring law enforcement officers to obtain the consent of defense counsel before initiating contact with Farrell.

12. The trial court omitted Blankenship's account of conversations between Farrell, Blankenship,

and the victim both while she was in the trunk and while Farrell and Blankenship were restraining her, on the grounds that the statements could have an inappropriate emotional impact on the jury.

A statement which ... at the time of its making ... so far tended to subject [the declarant] to civil or criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

CRE 804(b)(3).

### A.

▇ The first question under the Rule is whether the declarant is unavailable for purposes of the Rule. The prosecution has the burden of demonstrating such unavailability. *Blecha v. People,* 962 P.2d 931, 940 (Colo. 1998). In this case, the People maintained that Blankenship was not available because the previous week he had asserted his Fifth Amendment privilege against self-incrimination on the basis that he had viable appellate issues in his own case. Defendant argues that the People failed to demonstrate unavailability. At trial, defense counsel argued against the admission of Blankenship's statement based on the Sixth Amendment right to confrontation, but did not raise the issue of availability. The prosecution made the following statement:

> We are, in fact, relying on 804(b)(3), hearsay exception for statements against interest when a declarant is unavailable. The Court knows that the declarant, Kevin Blankenship, is unavailable. The Court has had Mr. Blankenship with his counsel saying he would not talk to anyone. And the Court knows that at the conclusion of last Friday's trial, when the Court was setting a sentencing date, Mr. Blankenship, through his counsel, indicated that he would not even talk to the probation department; that he believes he has valid appellate issues, and that his instructions—counsel's instructions to Mr. Blankenship was not to talk to anyone.
>
> Now, we can bring Mr. Blankenship over here and have him make that record with Mr. Moya, but I think the record is clear before the Court now. I'm prepared

to have Mr. Blankenship brought over if the Court would like or counsel would like.

After the prosecutor's offer, the defense counsel neither requested that Blankenship appear nor made any objection based on availability even when the judge specifically asked the defense counsel if he had any further concerns.

The trial judge who presided over Farrell's trial was the same judge who presided over the trial of Blankenship. Blankenship's trial preceded Farrell's. The trial judge was present when Blankenship invoked his Fifth Amendment rights in his own case. Accordingly, that judge was justified in relying upon such invocation in the related trial without making a new record. By admitting Blankenship's statement under CRE 804(b)(3), the trial court found, without so stating, that the People had established the declarant's unavailability. Such determination is sufficiently supported by the record.

### B.

▇ Thus, we turn to the substance of the statement to determine its admissibility. On its face, Blankenship's statement qualifies as a statement against interest because through his admissions, Blankenship exposed himself to liability for multiple criminal charges, including the murder of Castor. However, we cannot end our inquiry there, but must move from the technical analysis of the Rules to the broader analysis of the constitutional implications.

▇ Even if a statement would qualify as an exception to the hearsay rule, the court must deem it inadmissible if it would violate a defendant's constitutional right to confrontation. U.S. Const. amend. VI; *Stevens,* 29 P.3d at 311; *People v. Newton,* 966 P.2d 563, 573 (Colo.1998); *Blecha,* 962 P.2d at 941. The test for a hearsay statement that would not deprive a defendant of his constitutional right to be confronted with the witnesses against him is whether " 'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility.' " *Lilly v. Virginia,* 527 U.S. 116, 136, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (quoting *Idaho v.*

*Wright,* 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)). To meet that high burden of truthfulness, the statement must either (1) fall within a firmly rooted hearsay exception, or (2) bear particularized guarantees of trustworthiness. *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Stevens,* 29 P.3d at 311.

This court has acknowledged that a co-defendant's confession given during a custodial interrogation may be motivated by the co-defendant's desire to minimize his own culpability by implicating the accused; and, therefore, courts should view the statement with special suspicion. *Stevens,* 29 P.3d at 313; *see also Lilly,* 527 U.S. at 131–32, 119 S.Ct. 1887. In *Stevens,* when addressing the same argument made by the People in this case, we determined that a "statement against interest by a co-defendant made during custodial interrogation does not fall within a firmly rooted hearsay exception." *Stevens,* 29 P.3d at 313. Because Blankenship is a co-defendant who made a statement against interest in the course of a custodial interrogation, his statement cannot be classified as falling under a firmly rooted exception to the hearsay rule.

### C.

■ Accordingly, we turn to the question of whether Blankenship's statement possesses sufficient guarantees of trustworthiness to be admissible under the reliability requirements of the Confrontation Clause. *Lilly,* 527 U.S. at 135, 119 S.Ct. 1887; *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531; *Stevens,* 29 P.3d at 313. The People argue that the self-inculpatory nature of the statement, the absence of an expectation of benefit accruing to Blankenship, and Defendant's interlocking statements both to Maldonado and to the detention facility deputy all support a finding of reliability. The People assert that the totality of the circumstances surrounding Blankenship's statement justifies the admission of the confession.

To the contrary, Defendant argues that Blankenship's custodial statement implicating Defendant should have been inadmissible because of the strong presumption against the statement's reliability. The court of appeals

agreed, finding that neither the inherently self-inculpatory nature of the statement nor the circumstances surrounding the making of the statement demonstrated its trustworthiness or reliability. *Farrell,* 10 P.3d at 676–77.

■ In deciding whether Blankenship's statement bears the particularized guarantees of trustworthiness necessary to justify its admission, we must examine the totality of the circumstances surrounding the making of the statement. *Stevens,* 29 P.3d at 314. We have held that the Confrontation Clause requires hearsay evidence to possess indicia of reliability based on inherent trustworthiness, not based on other evidence at trial. *Id.; Newton,* 966 P.2d at 574. The court should predicate its reliability determination on an examination of the circumstances surrounding the making of the statement. *Stevens,* 29 P.3d at 314; *Newton,* 966 P.2d at 575. In considering whether a statement bears particularized guarantees of trustworthiness, a court has considerable discretion in determining what factors may enhance or detract from the statement's reliability. *Wright,* 497 U.S. at 822, 110 S.Ct. 3139.

Our cases have recognized that where, when, and how the declarant made the statement, to whom the declarant made the statement, what prompted the statement, and the statement's contents all provide indicia of reliability. *Newton,* 966 P.2d at 576. Additionally, we have found the nature and character of the statement, the relationship of the parties, the declarant's probable motivation for making the statement, and the circumstances surrounding the making of the statement probative of the statement's trustworthiness. *Stevens,* 29 P.3d at 314; *People v. Fuller,* 788 P.2d 741, 745 (Colo.1990). In *Stevens,* we identified several factors to consider when assessing a hearsay statement's trustworthiness: (1) whether the statement was truly self-inculpatory; (2) whether the statement was detailed; (3) whether police officers threatened or coerced the defendant to make the statement; (4) whether the confession was offered in exchange for leniency; (5) whether the declarant was likely to have personal knowledge of the events in the statement; (6) whether the declarant made

the statement shortly after the described events; (7) whether the declarant had a reason to retaliate against the defendant; and (8) whether the declarant was mentally or physically unstable at the time of the confession. *Stevens,* 29 P.3d at 314 (citing *United States v. Gomez,* 191 F.3d 1214, 1222–23 (10th Cir.1999) and *Earnest v. Dorsey,* 87 F.3d 1123, 1134 (10th Cir.1996)).

In *Stevens,* we observed that the most important factor in evaluating the reliability of the tendered statement is whether it was genuinely self-inculpatory. *Stevens,* 29 P.3d at 314. A court must evaluate whether the statement is genuinely self-inculpatory or merely shifts the blame from the declarant to the defendant. *Id.* In this case, we view the statement as truly self-inculpatory for the following reasons. Blankenship accepted direct culpability and did not try to minimize his own involvement. He continuously used "we" throughout the entire confession, thereby exposing himself to full liability for each criminal act. Further, Blankenship attributed many of the most incriminating actions, including brandishing the BB gun, refusing to exit the car, and putting Castor in the trunk of the car, solely to himself. He also took sole responsibility for many of the most destructive acts of vandalism, detailing his own criminal acts while Defendant was showering, sleeping, or watching television.

Because Blankenship did not attempt to minimize his participation and rarely attributed an action to Defendant without also highlighting his own involvement, his statements inculpating the defendant are inextricably intertwined with the self-inculpatory portions of his confession.[13] As we acknowledged in *Stevens,* the genuinely self-inculpatory nature of the entire statement distinguishes Blankenship's statement from those accomplice confessions that attempt to shift responsibility to the defendant while tending to minimize the accomplice's own culpability. *Stevens,* 29 P.3d at 315; *cf. Lilly,* 527 U.S. at 121, 138, 119 S.Ct. 1887 (expressing concern that the declarant would exonerate himself by transferring blame to the defendant

where declarant had explained that the defendant, not the declarant, had committed murder). Hence, Blankenship's statement is blatantly self-inculpatory.

In addition to being self-inculpatory, Blankenship's statement also meets various other tests we have identified as being pertinent to this inquiry. For example, it describes the various crimes and sequence of events at a level of detail that would be difficult to fabricate. Trustworthiness is buttressed by the likelihood that the declarant would have been unable to fabricate the details without having observed or participated in the events. *Stevens,* 29 P.3d at 317; *see also Gomez,* 191 F.3d at 1222–23; *Earnest,* 87 F.3d at 1134. In the present case, Blankenship provided detailed descriptions of the events and conversations that occurred, the surroundings at each stage of the criminal episode, and the actions attributable to each party. Further, Blankenship made his statement immediately after the criminal episode, making it unlikely that his recollection was faulty. *See Gomez,* 191 F.3d at 1222.

Blankenship made his statement in a custodial setting after the police officers had issued Blankenship his *Miranda* warnings and in response to some leading questions. Importantly, however, the police officers did not threaten or coerce Blankenship in order to obtain his statement. *See Stevens,* 29 P.3d at 316. Further, Blankenship's confession was not the result of any offers of leniency or special deals. *See id.; see also Earnest,* 87 F.3d at 1134. The officers did state that there was a possibility that Castor was still alive and that the sooner they found her the better it would be for everyone. They also informed Blankenship that Farrell had talked to Maldonado who, in turn, had talked to the police. However, they did not threaten Blankenship with more severe penalties or use improper tactics. The police did not offer Blankenship any special treatment in return for his cooperation, and Blankenship did not inquire as to any possible benefits. There is no evidence indicating that Blanken-

---

13. Even when the police attempted to focus attention on Defendant, Blankenship usually asserted his own involvement. For example, when the police asked Blankenship what he saw Defen-

dant take from Mrs. Castor's house, Blankenship responded, "Me and him just mostly took change and stuff."

ship made his statement as a result of threats, coercion, or promises of leniency.

Further, nothing in the statement suggests that Blankenship had any reason to retaliate against Defendant. *See Stevens*, 29 P.3d at 317. Blankenship's confession did not reveal any animosity between him and Defendant. In fact, initially, Blankenship attempted to protect both himself and Defendant by stating that neither of them knew the whereabouts of Castor. When he confessed, he did not attempt to spread or shift the blame to Farrell but fully acknowledged his own participation and acts with no hint of animosity toward Defendant.

Additionally, Defendant and Blankenship were together throughout the course of these events, clearly establishing that the declarant would have personal knowledge of the events in the statement. *See Stevens*, 29 P.3d at 314. Finally, in examining the declarant's mental and physical fitness at the time of the confession, the question is whether the declarant's agitation was much greater than would normally be expected from one arrested on a murder charge. *Stevens*, 29 P.3d at 318; *see also Earnest*, 87 F.3d at 1132. Here, Blankenship was not unduly agitated when he made the statement. The court of appeals in his case found that the confession proceeded in a conversational, calm, and non-threatening manner and that Blankenship did not pause or hesitate during the course of his statement. *People v. Blankenship*, 30 P.3d 698, 704 (Colo.App.2000), *cert. denied*, No. 01SC129 (Colo. Sept. 10, 2001).[14]

Therefore, our analysis of Blankenship's statement demonstrates that it was genuinely self-inculpatory, not induced by threats, coercion, or promises, and not intended to shift blame to Defendant. We find that, although the statement does not fall into a firmly rooted hearsay exception, it was nonetheless supported by sufficient guarantees of trustworthiness to support its admissibility under the Confrontation Clause.

### III.

Hence, we reverse the judgment of the court of appeals regarding the admissibility of the statement and remand this case to that court for return to the trial court for further proceedings consistent with this opinion and with the remainder of the court of appeals' opinion.

Justice BENDER dissents, and Justice MARTINEZ joins in the dissent.

Justice BENDER, dissenting:

Because the majority applies the decision of *Stevens v. People*, 29 P.3d 305 (Colo.2001), as controlling precedent, I respectfully DISSENT for the reasons stated in my dissent in *Stevens*.

I am authorized to say that JUSTICE MARTINEZ joins in this dissent.

---

14. The court of appeals in this case was concerned that Blankenship was only sixteen years old when the statement was made. However, in the companion case of *Blankenship*, 30 P.3d at 706–07, another panel of the court of appeals concluded that since Blankenship was a runaway from a state other than Colorado, under section 19–2–210(2), 8B C.R.S. (Supp.1996), although a parent, guardian, or legal custodian was not present when Blankenship made his statement, his confession was nonetheless admissible because he was of sufficient age and understanding to waive his rights himself.