**F I L E D**

**UNITED STATES COURT OF APPEALS**

**January 9, 2007**

**TENTH CIRCUIT**

ANTONIO FARRELL,

    Petitioner-Appellant,

v.

RICK SOARES, Warden; and JOHN SUTHERS, Attorney General, State of Colorado,

    Respondents-Appellees.

No. 05-1141

(D. Colorado)

(D.C. No. 03-cv-00286-REB-BNB)

---

**ORDER AND JUDGMENT**[*]

---

Before **HENRY**, **ANDERSON**, and **MCCONNELL**, Circuit Judges.

---

Petitioner Antonio Farrell was convicted after a jury trial in Colorado state court of eleven offenses arising out of the November 1996 abduction and murder of Barbara Castor and subsequent burglaries.[1]  He received a mandatory life

---

[*]  This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 (eff. Dec. 1, 2006) and 10th Cir. R. 32.1 (eff. Jan. 1, 2007).

[1]  In particular, the jury convicted Mr. Farrell of first-degree murder (a violation of Col. Rev. Stat. § 18-3-102(1)(a)); felony first-degree murder (a violation of Col. Rev. Stat. § 18-3-102)(1)(b)); robbery of an at-risk adult (a violation of Col. Rev. Stat. § 18-6.5-103(4) and 18-4-301); aggravated robbery (a violation of Col. Rev. Stat. § 18-4-302(1)(a)); second-degree kidnapping (a

(continued...)

sentence and additional consecutive sentences totaling fifty-six years.

At Mr. Farrell's trial, the prosecution offered a videotaped statement of Mr. Farrell's co-defendant, Kevin Blankenship, who told police officers that he and Mr. Farrell had kidnapped Mrs. Castor, driven her to an isolated area, tied her up and left her there. Then, Mr. Blankenship said, the two men had broken into Mrs. Castor's house and a nearby garage and stolen money, weapons, and other property.

The Colorado Court of Appeals reversed Mr. Farrell's convictions, concluding that the admission of Mr. Blankenship's statement violated Mr. Farrell's Sixth Amendment right to confront the witnesses against him and that the error was not harmless. *See People v. Farrell*, 10 P.3d 672 (Colo. Ct. App. 2000). However, the Colorado Supreme Court disagreed with that analysis, holding that Mr. Blankenship's statement was "sufficiently self-inculpatory to be deemed reliable," and that, as a result, the admission of the statement did not

---

[1](...continued)
violation of Col. Rev. Stat.§ 18-3-302); two counts of second-degree burglary (violations of Col. Rev. Stat.§18-4-203(2)(a)); theft ( a violation of Col. Rev. Stat.§ 18-4-401(a)(a));  first-degree criminal trespass (a violation of  § 18-4-502); and two counts of conspiracy (violations of Col. Rev. Stat. § 18-2-201(1)). The trial court sentenced Mr. Farrell to a mandatory life sentence for the merged first-degree murder convictions and concurrent sentences for the aggravated robbery, kidnapping, second-degree burglary, theft, first-degree criminal trespass, and conspiracy convictions. In addition, the trial court, finding extraordinarily aggravating circumstances, sentenced Mr. Farrell to consecutive sentences totaling fifty-six years for the convictions of robbery of an at-risk adult and second-degree burglary against a second victim.

violate Mr. Farrell's Confrontation Clause rights. *People v. Farrell*, 34 P.3d 401, 404 (Colo. 2001).

Mr. Farrell then filed a 28 U.S.C. § 2254 habeas corpus petition in the federal district court. Although that court disagreed with some of the Colorado Supreme Court's analysis, it too concluded that Mr. Blankenship's out-of-court statement was sufficiently reliable to support its admission without an opportunity for cross-examination.

We exercise jurisdiction under 28 U.S.C. §§ 1291 and 2253. Upon review of the record and the applicable law, we conclude that the admission of Mr. Blankenship's statement violated Mr. Farrell's Confrontation Clause rights. However, we further conclude that this error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). We therefore affirm the district court's denial of Mr. Farrell's § 2254 petition.

## I. BACKGROUND

We first discuss the pertinent facts underlying Mr. Farrell's convictions and then summarize relevant court proceedings.

A.    The crimes and Mr. Blankenship's statement

In November 1996, neighbors of 76-year-old Barbara Castor saw unknown

individuals in her Brighton, Colorado home and contacted the police, who found it ransacked and looted. While police were investigating the residence, Michael Maldonado arrived at Mrs. Castor's house. Officers arrested him on an outstanding warrant. Mr. Maldonado told them that he and two other teenagers, Mr. Farrell and Mr. Blankenship, had looted the residence. Mr. Maldonado also stated to the officers that the three of them had stolen guns from a garage at another house. Mr. Maldonado reported that Mr. Farrell and Mr. Blankenship said the homeowner would not return because they had "taken care of" her. State Ct. Rec. vol.12, at 422.

Based on information obtained from Mr. Maldonado and others, officers arrested Mr. Blankenship and Mr. Farrell at a friend's house at approximately 10 p.m. on November 18, 1996. Officers found items belonging to Mrs. Castor in the pockets of both young men and in the room where they were arrested. Officers transported both suspects to the Adams County substation.

At 11:50 p.m., Detectives John Williams and Harold Lawson of the Adams County Sheriff's Department began to question Mr. Blankenship. At the beginning of the interview, the detectives read Mr. Blankenship his *Miranda* warnings, and he agreed to talk.

Mr. Blankenship first asserted that he and Mr. Farrell had stolen Mrs. Castor's car at a K-Mart store in Brighton, found her driver's license in the car, and looted her house before she returned. When the detectives asked why the

young men had returned to the house over several days without concern about Mrs. Castor's return, Mr. Blankenship responded, "I don't know." State's Ex. 78 (Blankenship Tr.) at 10. Detective Williams then said, "Okay, Kevin . . . I'm gonna get serious now." *Id.*

The detectives explained that Mr. Farrell had been "shooting his mouth off to his girlfriend" and to Mr. Maldonado, and that police had already spoken with them. *Id.* at 11. Detective Williams told Mr. Blankenship that "we've been told what Tony's been saying, that the lady's been in the trunk, and that the lady's somewhere out in a field." *Id.* at 11. Mr. Blankenship responded, "I know, that's . . . what I wanted to talk to you about." *Id.* The officers stressed to Mr. Blankenship that they needed to find Mrs. Castor because she might still be alive. They urged him to release the "weight on [his] shoulders" by helping to find Mrs. Castor to "make it right with her family." *Id.* at 27.

Mr. Blankenship later admitted that he did not know where Mrs. Castor was because he did not know where he and Mr. Farrell had left her. He stated that the two young men had asked Mrs. Castor for a ride, and that she had driven them to a gas station and told them to get out. Mr. Farrell got out, but Mr. Blankenship brandished a BB gun and told her to keep driving. Shortly thereafter, Mr. Blankenship directed her to stop. He forced her into the trunk and then returned to pick up Mr. Farrell. The two men drove for "a long way," *id.* at 31, until they reached a deserted area. There, Mr. Farrell and Mr. Blankenship tied Mrs. Castor

-5-

to a cement structure with string and a blanket from her car. They proceeded to pile pieces of wood, rocks, and a spare tire on top of her. As they were driving away, Mr. Blankenship claimed that Mr. Farrell said "[G]od will get us for this," so they said a prayer. *Id.* at 36.

Mr. Farrell and Mr. Blankenship then examined Mrs. Castor's driver's license and stopped at a gas station to get directions to her house. They eventually found it, used her keys to gain entry, and ransacked it. Mr. Blankenship described how he and Mr. Farrell returned to the house several times over the next three days–to sleep, shower, and search for valuables.

Mr. Blankenship also stated that he and Mr. Farrell had stolen guns from a garage at a different house. He said they lived in Rockford, Illinois, and had stolen two cars and hitchhiked to reach Colorado. The two young men came to Colorado to see Mr. Farrell's fiancee.

The interrogation ended at 1:09 a.m. Based on the information from Mr. Blankenship, the police disseminated news bulletins and later located Mrs. Castor's body near old dam ruins. The medical examiner reported that she had died of hypothermia due to exposure to the cold weather.

B.     Trial proceedings

The State of Colorado charged Mr. Farrell and Mr. Blankenship as adults with first-degree murder, felony murder, kidnaping, robbery, burglary, criminal

trespass, conspiracy, and related counts based on Mrs. Castor's death, the looting of her house, and the guns stolen from the garage of another residence. The State tried Mr. Blankenship first, and a jury convicted him on all counts.

At Mr. Farrell's trial, Mr. Blankenship asserted his Fifth Amendment privilege against self-incrimination. Mr. Farrell then moved to exclude Mr. Blankenship's custodial statement, arguing that its untested introduction would violate the Confrontation Clause. The trial court found the statement against Mr. Blankenship's penal interest and therefore admissible under Colo. R. Evid. 804(b)(3). The court further concluded the statement was sufficiently reliable for Confrontation Clause purposes because other evidence corroborated it. The court redacted certain portions of Mr. Blankenship's statement, such as his account of the young men's conversation with Mrs. Castor as they were restraining her, as being too prejudicial.

At Mr. Farrell's trial, the jury saw the videotape of Mr. Blankenship's interrogation and also received a redacted transcript of it. Several other witnesses testified about the activities of Mr. Farrell and Mr. Blankenship before and after Mrs. Castor's disappearance.

In particular, Mr. Maldonado testified that Mr. Farrell came to his house periodically between November 10 and November 14. Mr. Maldonado described how the three of them broke into a garage window and stole two rifle cases during the night of November 14. After the three of them stole the guns, they went to

Mrs. Castor's house. Mr. Maldonado testified that, while the three men were there, Mr. Blankenship told him they had forced Mrs. Castor to give them a ride, and later pulled a gun on her and put her in the trunk of her car. Mr. Maldonado said that when he told the young men they were going to be in trouble, they "just laughed like, 'We took care of that. It won't happen.'" State Ct. Rec, vol. 12, at 410. While at the house, both Mr. Blankenship and Mr. Farrell told Mr. Maldonado they had left the lady in a field, covered with rocks and branches. Mr. Maldonado indicated that both Mr. Farrell and Mr. Blankenship provided the description at the same time, and he thought that the two young men had been bragging about their actions. Mr. Maldonado further testified that, during the time at Mrs. Castor's house, Mr. Farrell appeared normal and was capable of having a normal conversation.

Shaun Vigil testified that he had shopped with Mr. Farrell and Mr. Blankenship on November 15, 1996. Mr. Farrell made several purchases with cash. Mr. Vigil testified that Mr. Farrell had acted normally with no bizarre behavior. Mr. Vigil noted at trial that Mr. Farrell and Mr. Blankenship had taken a souvenir photograph of themselves that looked like a "wanted poster." *Id*. vol. 13, at 604-05.

The government also introduced considerable physical evidence linking Mr. Farrell and Mr. Blankenship to the crimes. In the room where the two young men were arrested, officers found Mrs. Castor's car registrations, insurance card, and

phone calling card. Officers also discovered plastic bags of new clothing in the attic at the residence. When arrested, Mr. Farrell was carrying a wallet containing approximately $600 and two rings.

Inside Mrs. Castor's car, officers found a jacket containing Mr. Blankenship's identification, Mrs. Castor's wedding ring set, and a necklace. Detectives found Mr. Farrell's fingerprints on a door and window of Mrs. Castor's car, and on a shopping bag in the trunk of her car. At Mrs. Castor's residence, officers recovered Mr. Farrell's fingerprints from the filing cabinet and upstairs bathroom window. Three pubic hairs from the shower were consistent with Mr. Farrell's hair and inconsistent with those of Mr. Blankenship and Mr. Maldonado.

In response to the State's case, Mr. Farrell asserted that he was not guilty by reason of insanity. He offered testimony from two psychologists who testified that he suffered from a major depressive disorder with possible psychotic features. Because the psychiatric disorder was episodic, both defense psychologists said, they could not conclusively determine whether Mr. Farrell was legally sane when he left Mrs. Castor in the field. In rebuttal, the State called a forensic psychiatrist and a psychologist. The forensic psychiatrist testified that Mr. Farrell was mentally sane during the offenses. The psychologist agreed, stating that "[Mr. Farrell] could understand the consequences of his acts and form intent to do things he wanted to do." *Id.* vol. 14, at 821. Additionally, the

psychologist questioned some of Mr. Farrell's responses to the personality tests he had been administered:

> I concluded that he was malingering, based on a number of things. One, [the results of a personality test were] . . . exaggerated, in contrast to his clinical presentation; that is, how he looked to me when I interviewed him and how he looked on the unit.

> . . . . They were incongruent. He didn't look crazy or as disorganized and he presented on the [personality test] when I spoke to him face to face and also when he was observed on the unit.

> Secondly, those data were also stri[]kingly in contrast to the data he gave me on the Rorschach. So since I've done many of these before, the conclusions were easy to reach; and that was that [Mr. Farrell] was exaggerating his level of psychopathy or his craziness in order to gain some secondary benefit.
> . . .

*Id.* at 814-15. When the prosecutor asked, "What might that secondary benefit be?," the psychologist responded, "[T]o achieve some kind of reduction in consequences from the legal system." *Id.* at 815.

The jury convicted Mr. Farrell of all of the charged offenses.

C.     Direct appeal

The Colorado Court of Appeals reversed Mr. Farrell's convictions, ruling that the admission of Mr. Blankenship's statement without cross-examination violated Mr. Farrell's rights under the Confrontation Clause. *See Farrell*, 10 P.3d at 676-77. The appellate court examined the Supreme Court's decision in *Lilly v. Virginia*, 527 U.S. 116, 138-39 (1999) and concluded that the custodial statement was too unreliable to be introduced without cross-examination. The Colorado

-10-

Court of Appeals further held that the Confrontation Clause error was not harmless. *Farrell*, 10 P.3d at 678.

The Colorado Supreme Court reinstated Mr. Farrell's convictions. *Farrell*, 34 P.3d at 408. It held that Mr. Blankenship's statement was "supported by sufficient guarantees of trustworthiness" and that, as a result, its admission had not violated Mr. Farrell's Confrontation Clause rights. *Id*. In reaching that conclusion, the Colorado Supreme Court significantly relied on the factors it had identified in *Stevens v. People*, 29 P.3d 305 (Colo. 2001). The court noted that "[i]n *Stevens*, we observed that the most important factor in evaluating the reliability of the tendered statement is whether it was genuinely self-inculpatory." *Farrell*, 34 P.3d at 407. The court characterized Mr. Blankenship's statement as "genuinely self-inculpatory, not induced by threats, coercion, or promises, and not intended to shift blame to [Mr. Farrell]." *Id.* at 408.

The Colorado Supreme Court also observed that the statement "meets various other tests we have identified as being pertinent to [the reliability] inquiry." *Id.* at 407. In the court's view, the statement described the crimes "at a level of detail that would be difficult to fabricate." *Id*. Moreover, Mr. Blankenship (a) made the statement soon after the crime, (b) was not threatened or coerced by the police officers who interrogated him, (c) receive no offers of leniency, (d) did not evince any intent to retaliate against Mr. Farrell by shifting blame to him, (e) had "personal knowledge of the events in the statement," and (f)

"was not unduly agitated when he made the statement." *Id.* at 407-08.

For the same reasons they set forth in *Stevens,* Justices Bender and Martinez dissented. In their view, Mr. Blankenship's statement was not sufficiently reliable to insulate it from the requirements of the Confrontation Clause. *Id.* at 408 (Bender, J., dissenting).

D.    Federal habeas corpus proceedings

On February 7, 2003, Mr. Farrell filed a federal habeas petition under 28 U.S.C. § 2254. The district court appointed counsel, and Mr. Farrell's amended petition raised only the Confrontation Clause claim.

Although it disagreed with the Colorado Supreme Court's analysis in important respects, the district court denied Mr. Farrell's petition. The district court first held that the Colorado Supreme Court had ruled contrary to clearly established federal law when it relied on the apparent voluntariness of Mr. Blankenship's statement in assessing its reliability. However, on subsequent de novo review, the district court concluded that other indicators of reliability sufficiently supported the admission of Mr. Blankenship's statement without cross-examination. In its assessment, the district court did not characterize the plurality decision in *Lilly v. Virginia* as clearly established federal law.

Mr. Farrell timely appealed and applied for a certificate of appealability (COA) pursuant to 28 U.S.C. § 2253(c)(1)(A). The district court granted a COA on Mr. Farrell's Confrontation Clause claim.

## II. DISCUSSION

### A. Standard of review

The provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") govern this appeal. *See Brown v. Uphoff*, 381 F.3d 1219, 1223 (10th Cir. 2004). Therefore, we can only grant § 2254 relief if the Colorado Supreme Court's adjudication of Mr. Farrell's claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's adjudication is "contrary to" clearly established federal law if the state court (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives as a result different from" the Court's result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The "unreasonable application" clause is met if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08.

If we conclude the state court's reasoning was contrary to clearly established federal law, we do not apply deference under AEDPA to the Colorado Supreme Court's decision. *Stevens*, 465 F.3d at 1239; *Brown*, 318 F.3d at 1225. We instead determine de novo whether the admission of Mr. Blankenship's statement violated Mr. Farrell's rights to confront witnesses against him under the

-13-

Sixth Amendment. *Brown*, 381 F.3d at 1225.

B.    Clearly established federal law

We now consider whether the Colorado Supreme Court ruled contrary to, or unreasonably applied, clearly established federal law that existed when Mr. Farrell's state convictions became final. *Williams*, 529 U.S. at 381. The state court reinstated Mr. Farrell's convictions on October 22, 2001, and issued a modified en banc opinion on November 13, 2001. Because Mr. Farrell's convictions became final before the Supreme Court issued its decision in *Crawford v. Washington*, 541 U.S. 36 (2004), that decision does not apply to our review of Mr. Farrell's claim. *Brown*, 381 F.3d at 1227 (concluding that *Crawford* "is not retroactively applicable" to cases then on collateral review).

In our recent decision in *Stevens v. Ortiz*, 465 F.3d 1229 (10th Cir. 2006),[2] we described the relevant Confrontation Clause authority before *Crawford*. We examined in detail the Supreme Court's decision in *Lilly v. Virginia*, 527 U.S. 116 (1999), the most recent discussion of the Confrontation Clause before Mr. Farrell's convictions became final in November 2001. In *Stevens*, we treated the *Lilly* plurality opinion as the holding of the Court. *Stevens*, 465 F.3d at 1237 *(citing Marks v. United States*, 420 U.S. 188, 193 (1977)).

The *Lilly* plurality identified several factors on which courts should not rely

---

[2] Because of the similarity in issues and counsel, we consolidated *Stevens* and Mr. Farrell's appeal for oral arguments.

in assessing the reliability of an accomplice's hearsay statement: (1) the voluntariness of an accomplice's confession, *Lilly*, 527 U.S. at 138; *Lee v. Illinois*, 476 U.S. 530, 544 (1986); (2) the presence of corroborating evidence, *Lilly*, 527 U.S. at 137-38; *Idaho v Wright*, 497 U.S. 805, 822 (1990); (3) the absence of an offer of leniency, *Lilly*, 527 U.S. at 138-39; and (4) the presence of statements strongly against penal interest, *id.*; *Brown*, 381 F.3d at 1227 n.6.

B.     Review of the Colorado Supreme Court's decision under AEDPA

The Colorado Supreme Court held that Mr. Blankenship's custodial statement to detectives did "not fall into a firmly rooted hearsay exception, [but] it was nonetheless supported by sufficient guarantees of trustworthiness to support its admissibility under the Confrontation Clause." *Farrell*, 34 P.3d at 408. In his habeas petition, Mr. Farrell maintains that the state court ruled contrary to or unreasonably applied clearly established federal law when it relied on the following four factors in assessing the reliability of Mr. Blankenship's statement: (1) the statement's genuinely self-inculpatory nature; (2) the statement's voluntariness; (3) the existence of evidence corroborating the statement; and (4) the absence of a promise of leniency to Mr. Blankenship.

For the same reasons set forth in *Stevens*, we conclude that insofar as it relied on the "genuinely self-inculpatory" nature of Mr. Blankenship's statement, *Farrell*, 34 F.3d at 408, and the absence of a promise of leniency as factors indicating the statement's reliability, the Colorado Supreme Court's reasoning

-15-

was contrary to clearly established federal law. *See Stevens*, 465 F.3d at 1238, 1240; *see also Lilly*, 527 U.S. at 138-39 (holding that statements against penal interest "are suspect insofar as they inculpate other persons" and that "the absence of a promise of leniency to [a declarant] does not enhance his statement's reliability to the level necessary for their untested admission"); *Brown*, 381 F.3d at 1227 n.6 (interpreting *Lilly* to conclude that "the presence of some statements against penal interest" is not a relevant indicator of reliability).

We now separately examine the two other factors invoked by the Colorado Supreme Court and challenged by Mr. Farrell—the voluntariness of Mr. Blankenship statement and the fact that the statement was corroborated by other evidence.

1.    *Voluntariness of Mr. Blankenship's statement*

The Colorado Supreme Court recognized that Mr. Blankenship provided his statement in a custodial setting "after the police officers had issued Blankenship his *Miranda* warnings and in response to some leading questions." *Farrell*, 34 P.3d at 407. The state court further found it "[i]mportant[], however, the police officers did not threaten or coerce Blankenship in order to obtain his statement." *Id.* Mr. Farrell contends that the court based its reliability determination in part on the apparent voluntariness of Mr. Blankenship's statement.

The Court in *Lilly* concluded that a declarant's awareness of his *Miranda* rights "has little, if any, bearing on the likelihood of truthfulness of his

-16-

statements." 527 U.S. at 138. Also, the fact that a custodial statement is voluntary "does not bear on the question of whether the confession was also free from any desire, motive, or impulse [the declarant] may have had either to mitigate the appearance of his own culpability by spreading the blame or to overstate [the defendant's] involvement" in the murder. *Lee*, 476 U.S. at 544. We agree with Mr. Farrell that the Colorado Supreme Court considered the apparent voluntariness of Mr. Blankenship's statement as bearing on its truthfulness, and reliance on such a factor is contrary to the reasoning of *Lilly* and *Lee*. *See Brown*, 381 F.3d at 1225 (concluding that a state court's reliance on the voluntariness of a declarant's statement was contrary to *Lee*).

2.      *Evidence corroborating Mr. Blankenship's statement*

The Colorado Supreme Court also considered it "pertinent" to its reliability determination that Mr. Blankenship's statement "describes the various crimes and sequence of events at a level of detail that would be difficult to fabricate." *Farrell*, 34 P.3d at 407. The court further noted that "Blankenship provided detailed descriptions of the events and conversations that occurred, the surroundings at each stage of the criminal episode, and the actions attributable to each party." *Id.*

The Supreme Court has expressly stated that corroborative evidence cannot be used to assess the reliability an accomplice's hearsay statement. *See Lilly*, 527 U.S. at 137 ("That other evidence at trial corroborated portions of [the

declarant's] statements is irrelevant."); *Wright*, 497 U.S. at 822 (rejecting the argument that evidence corroborating a hearsay statement supports a finding of trustworthiness). Mr. Farrell contends that the state court's mention of the statement's details was essentially an improper reliance on corroborating evidence. We agree with Mr. Farrell that a fanciful declarant could infuse a confession with a level of detail that we would more commonly associate with someone who has observed the actual events. Nonetheless, when the Colorado Supreme Court issued its decision in Mr. Farrell's case, the United States Supreme Court had not clearly rejected the level of detail in a statement as a factor indicating reliability. Therefore, the Colorado Supreme Court did not rule contrary to *Lilly* or *Wright* by relying on the level of detail in Mr. Blankenship's statement. *See Brown*, 381 F.3d at 1228 (concluding that a district court did not rule contrary to pre-*Lilly* Court precedent when it noted the statement "provided a level of detail about the crime and location of evidence that would be difficult to fabricate").[3]

_____

[3] We note however that, in *Crawford* (issued after the Colorado Supreme Court's opinion in this case), the United States Supreme Court appears unconvinced that the level of detail in an out-of-court statement may establish its reliability. *See Crawford*, 541 U.S. at 63 (noting that "[s]ome courts attach[] the same significance to opposite facts," such as holding a more detailed statement more reliable (citing *Farrell*, 34 F.3d at 407), "while the Fourth Circuit found a statement more reliable because the portion implicating another was 'fleeting'" (quoting *United States v. Phtogrammetric Data Servs, Inc.*, 259 F.3d 229, 245 (4th Cir. 2001)).

We therefore conclude that the state court's reasoning was contrary to clearly established federal law by relying on three impermissible factors to assess the reliability of Mr. Blankenship's statement: (1) the genuinely self-inculpatory nature of the statement, (2) its voluntariness, and (3) the absence of a promise of leniency.

C.    De novo review

Because the Colorado Supreme Court's reasoning was contrary to Supreme Court precedent, we now review de novo whether Mr. Blankenship's statement contained sufficient indicia of reliability to be admitted without cross-examination at Mr. Farrell's trial. *Stevens,* 465 F.3d at 1239; *Brown*, 381 F.3d at 1227. In our independent inquiry for trustworthiness, we examine Mr. Blankenship's statements and the setting in which he was questioned. *Lilly*, 527 U.S. at 139.

Again, our analysis is guided by our decision in *Stevens.* There, we observed that "[c]ourts have long recognized that an accomplice's confession in police custody 'is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.'" *Stevens,* 465 F.3d at 1241 (quoting *Lee,* 476 U.S. at 545).

Here, Mr. Blankenship was an accomplice who was interrogated in police

-19-

custody. As a result, his statement, like the one at issue in *Stevens*, must be presumed unreliable.

Moreover, like the declarant in *Stevens*, Mr. Blankenship attempted to shift much of the blame to the defendant. In particular, near the beginning of the interrogation, Mr. Blankenship stated that it was Mr. Farrell who had done most of the talking when the two teenagers first encountered Mrs. Castor. Mr. Blankenship eventually admitted during the interrogation that he had pointed a gun at Mrs. Castor and forced her into the trunk of her car. However, he maintained that it was Mr. Farrell who had driven the car out of town to the isolated location where the two teenagers tied her up and left her. Moreover, according to Mr. Blankenship, it was Mr. Farrell's idea to leave Mrs. Castor there. In addition, after initially indicating that Mr. Farrell had ripped up a blanket and that he (Mr. Blankenship) had tied up Mrs. Castor, *see* Blankenship Tr. at 30 (stating that "Tony, he [Mr. Farrell] was ripping it up and I tied her up"), Mr. Blankenship then stated "Tony mostly tied her up because I wouldn't get her or something," *Id*. at 39.

Also, like the declarant in *Stevens,* Mr Farrell first sought to exculpate himself. *See Stevens*, 465 F.3d at 1241. At the beginning of the interrogation, Mr. Blankenship denied any responsibility for Mrs. Castor's abduction and murder. He indicated that Mrs. Castor had left her keys in her car and that he and Mr. Farrell and driven away without her. It was only after police officers

reported that Mr. Farrell had stated that Mrs Castor was "somewhere out in a field," Blankenship Tr. at 11, and that the only way "to get that weight off [his] shoulders," *id*. at 27, was to help the police to find her, that Mr. Blankenship changed his story.

In our view, none of the other factors identified by the Colorado Supreme Court or the federal district court are sufficient to establish that "the reliability of Mr. [Blankenship's] statement is so apparent from the record that cross-examination at Mr. [Farrell's] trial would have been of only marginal utility." *Stevens*, 465 F.3d at 1243 (internal quotation marks omitted). The fact that Mr. Blankenship gave the statement soon after the crime, received no express offers of leniency, had personal knowledge of the events in the statement, and was not unduly agitated when he made the statement are all insufficient to rebut the presumed unreliability of an out-of court statement that was given by an accomplice during a custodial interrogation and that sought to shift blame to a substantial extent to the defendant on trial. *See Crawford*, 541 U.S. at 63 (noting that, in assessing the reliability of out-of-court statements, "[s]ome courts wind up attaching the same significance to opposite facts" and citing the Colorado Supreme Court's decisions in this case and in *Stevens* as examples: "the Colorado Supreme Court in one case found a statement more reliable because it was given immediately after the events at issue, . . . while that same court, in another case, found a statement more reliable because two years had elapsed") (internal

quotation marks omitted). As in *Stevens*, we therefore conclude that the statement's admission violated the petitioner's Sixth Amendment rights to confront the witnesses against him. *Id.*

D.    Harmless Error

The violation of Mr. Farrell's Confrontation Clause rights warrants habeas relief under 28 U.S.C. § 2254 only if it had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos*, 328 U.S. at 776). In undertaking that inquiry, we may consider "the importance of the . . . testimony in the prosecution's case; whether the testimony was cumulative; the presence . . . of evidence corroborating or contradicting the testimony of the witness on material points; the extent of the actual cross-examination otherwise permitted; and the overall strength of the prosecution's case." *Jones v. Gibson*, 206 F.3d 946, 957 (10th Cir. 2000) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). If we are "in grave doubt as to the harmlessness of the error . . . the [habeas] petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995). We examine the out-of court statement in light of the entire record to determine the error's possible effect on the jury. *Crespin v. New Mexico*, 144 F.3d 641, 649 (10th Cir. 1998).

In applying the *Brecht* standard to the evidence in the record, we first note that our inquiry differs from that undertaken by the Colorado Court of Appeals on direct appeal. That court was required to determine whether the Confrontation

Clause error was harmless beyond a reasonable doubt. Here, it is the *Brecht* standard that controls. *See Herrera v. Lemaster*, 301 F.3d 1192, 1197 (10th Cir. 2002) (observing that "the *Brecht* standard is less stringent than [the harmless error standard set forth] in *Chapman* [*v. California*, 386 U.S. 18 (1967)]," but that "it is still 'appropriately demanding'") (quoting *Brecht*, 507 U.S. 641 (Stevens, J., concurring).

Here, in arguing that Mr. Blankenship's statement had "a substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623, Mr. Farrell invokes the Colorado Court of Appeals's observation that Mr. Blankenship's statement provided "the primary, if not the sole, evidence detailing [Mr. Farrell's] specific acts and demonstrating his mental state during the commission of the crimes." Aplt's Br. at 45-46 (quoting *Farrell*, 10 P.3d at 678). He also observes that the prosecutor quoted or paraphrased Mr. Blankenship's statement in his opening statement and his closing argument.

We agree with the Colorado Court of Appeals to some extent—Mr. Blankenship's statement *was* the primary evidence describing Mr. Farrell's specific acts during the commission of the crimes, particularly the abduction and killing of Mrs. Castor. Nevertheless, that fact does not establish that the admission of the statement was prejudicial under the *Brecht* standard.

The primary issue at trial was not whether it was Mr. Farrell or Mr. Blankenship who committed the particular acts leading to the death of Mrs.

-23-

Castor and the various property crimes. There was little dispute that both men, acting in concert, abducted Mrs. Castor, tied her up, left her to die, and then burglarized her home and the garage of another residence. Moreover, the jurors received an instruction that Mr. Farrell could be found guilty as a "complicitor" if (a) the offense was committed by another person; (b) Mr. Farrell knew that the other person intended commit the crime; (c) Mr. Farrell had "the intent to promote or facilitate the commission of the crime;" and (d) Mr. Farrell "aided, abetted, advised, or encouraged the other person in the commission of the crime." State Ct. Rec. vol 1, at 240, Inst. 18.

Rather than the respective roles played by Mr. Farrell and Mr. Blankenship, the central issue at trial was Mr. Farrell's mental state at the time of the crimes. Mr. Farrell contended that he was not guilty by reason of insanity, and the evidence and arguments of his counsel concerned that issue. Thus, Mr. Farrell's two witnesses were both psychologists who discussed Mr. Farrell's history of mental health disorders. His counsel's closing argument did not address the events surrounding the crimes at all. Instead he discussed Mr. Farrell's troubled mental health history, contending that Mr. Farrell had been subjected to abuse for a long period of time and telling the jury that "the ultimate decision about what he was thinking and how he was functioning lies in your hands and I ask you to consider that history." *Id.* vol. 15, at 948.

On that issue, Mr. Blankenship's statement was not particularly

-24-

informative. While the expert witnesses disagreed about whether Mr. Farrell had a major psychiatric disorder that prevented him from knowing right from wrong or from forming the intent to commit the crimes at issue, Mr. Blankenship's statement did not directly address that question. Indeed, that fact is apparent from the evidence on which the experts relied in reaching their conclusions. Both the prosecution's and the defense's experts discussed Mr. Farrell's psychiatric history, the psychological tests that had been administered to him, and their clinical observations. They did not rely on the details provided by Mr. Blankenship.

To be sure, Mr. Farrell does point to one statement by Mr. Blankenship that arguably concerns Mr. Farrrell's mental condition at the time that he committed the crimes. According to Mr. Blankenship, as they were driving away from the site where they left Mrs. Castor, Mr. Farrell said that "[G]od will get us for this" and the two of them began to pray. Blankenship Tr. at 36. In Mr. Farrell's view, the prosecution used this part of the statement to prove its contention that he knew right from wrong, and it thus prejudiced the jury.

Again, this argument is undermined by the record as a whole. As the State observes, there was considerable other evidence rebutting Mr. Farrell's insanity defense. One of the defense psychologists told the jury that, in recounting the crimes, Mr. Farrell had indicated that he had prayed for Mrs. Castor's forgiveness. That testimony thus provided the jury with the same information

contained in Mr. Blankenship's account. In addition, the prosecution offered testimony from several witnesses who encountered Mr. Farrell shortly before and shortly after the abduction of Mrs. Castor. Like Mr. Blankenship, these witnesses indicated that Mr. Farrell had not engaged in any unusual behavior that would indicate that he did not know right from wrong or that he was incapable of forming the intent to commit the charged offenses. Apart from Mr. Blankenship's statement, the prosecution presented ample evidence supporting its theory that Mr. Farrell was not insane.

Accordingly, we conclude that the Confrontation Clause error caused by the admission of Mr. Blankenship's statement did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos*, 323 U.S. at 776).

## II CONCLUSION

For the reasons set forth in this order and judgment, we therefore AFFIRM the district court's order denying Mr. Farrell's 28 U.S.C. § 2254 petition for a writ of habeas corpus.

Entered for the Court,


Robert H. Henry
United States Circuit Judge